Oscar LANDRO, Frank J. Shafranski, Bernard F. Benna, Margarete Wilson and LeRoy H. Schultz, Plaintiffs-Appellees,

v.

GLENDENNING MOTORWAYS, INC.; Glendenning Enterprises, Inc.; Glendenning Enterprises, Inc. Retirement Plan and Trust, aka Glendenning Motorways, Inc. Retirement Plan and Trust, Defendants-Appellants,

Northwestern National Bank of Minneapolis, Trustee.

No. 79–1628.

United States Court of Appeals, Eighth Circuit.

Submitted March 10, 1980.

Decided July 7, 1980.

Rehearing and Rehearing En Banc Denied Aug. 8, 1980.

Henley, Circuit Judge, dissented and filed opinion.

Before LAY, Chief Judge, HENLEY, Circuit Judge, and HANSON,* District Judge.

HANSON, District Judge.

This is a suit under the civil enforcement provision of the Employee Retirement Income Security Act of 1974 (ERISA, or the Act), 29 U.S.C. § 1132. The pension plan in question was established by Glendenning Motorways, Inc. (Glendenning), one of the appellants, in 1968.[1] All appellees became employees of Glendenning in 1963; before then they had all been employees of Moland Brothers Trucking, Inc. (Moland), which was bought out by Glendenning in 1963. The main issue in the case is whether appellees are entitled to credit toward their pensions under the Glendenning pension plan for the years they worked for Moland. In the first of the rulings now on appeal, the district court,[2] after two days of trial to the court, held that "under the terms of the plan as interpreted by the Advisory Committee [established by the plan], plaintiffs must be given credit for their Moland years of service," and ordered appellants to compute appellees' pension benefits accordingly, making retroactive benefit payments where appropriate. *Landro v. Glendenning Motorways, Inc.*, No. Civ. 3–77–384 (D.Minn., filed May 30, 1979) (judgment entered accordingly the same day). By a separate order filed on July 6, 1979, the district court awarded appellees $10,125 in attorney's fees pursuant to 29 U.S.C. § 1132(g); the second issue before us is whether this award was proper. We affirm both rulings of the district court.

Sheridan J. Buckley, Jr., St. Paul, Minn., for defendants-appellants.

James J. Ryan, Thomas, King, Swenson, Collatz & Ryan, St. Paul, Minn., for plaintiffs-appellees.

## I.

The Glendenning Motorways, Inc. Retirement Plan and Trust (the Plan) was ap-

---

* The Honorable WILLIAM C. HANSON, Senior United States District Judge, for the Northern and Southern Districts of Iowa, sitting by designation.

1. Glendenning Enterprises, Inc., another of the appellants, was incorporated in 1972 to serve as the parent for several wholly-owned subsidiaries, including Glendenning Motorways, Inc. The pension plan here in question was amended in 1973 so as to cover all employees of any such subsidiary which adopted it by resolution of its board of directors. This action did not affect any of the appellees herein. The other appellant is the Glendenning Enterprises Retirement Plan and Trust. The fourth defendant in the case, Northwestern National Bank of Minneapolis, is the plan trustee; it has not actively participated in this litigation, but has stipulated that it will ensure that any order issued by the district court is implemented.

2. The Honorable Edward J. Devitt, Chief Judge, United States District Court for the District of Minnesota.

proved by the board of directors of Glendenning on December 27, 1968. The Plan was not collectively bargained; it was rather a unilateral undertaking by Glendenning, funded by Glendenning, in which only non-union or "non-contract" employees of the company were eligible to participate.[3] Four of the appellees—Landro, Shafranski, Benna and Schultz—were non-contract employees of both Moland and Glendenning; the fifth, Wilson, was a contract employee of Moland and of Glendenning until 1969, when she changed to non-contract status.[4]

By its terms the Plan was to be administered by an Advisory Committee consisting of two persons designated by the board of directors; the first two members of this Committee were William A. Glendenning and H. V. Stuntebeck, president and secretary of Glendenning Motorways, Inc., respectively.[5] The December 27, 1968 resolution of the board of directors approving the Plan also authorized William Glendenning and Stuntebeck "to settle and approve all details in connection with said Plan, exercising their discretion to such extent as they shall deem appropriate in determining any and all questions which may arise in connection with said Plan . . . ."[6] The Advisory Committee as such was empowered by the terms of the Plan, "subject to all other terms and provisions of this Trust Agreement," to "decide all questions arising in the administration, interpretation and application [of the Plan], which decisions shall be binding and conclusive on all parties;" and "[i]n the exercise of the powers conferred upon it, the Advisory Committee shall have the broadest possible discretion . . . ." Art. XI, §§ 3 and 7. The Plan further provided that:

> The COMPANY may amend this Trust at any time and from time to time by an instrument in writing executed in the name of the Company by an officer or officers duly authorized to execute such instrument . . . . .

It is clear that Glendenning, and William Glendenning and Stuntebeck in particular, had well-nigh absolute control over the terms of the Plan itself and over any questions arising in the administration, interpretation and application of those terms.

Before its complete restatement in 1977 the Plan itself may fairly be said, as the district court found, to have been "silent as to credit for years worked with a predecessor employer, such as Moland."[7] The original version of the Plan provided only that:

## ARTICLE VI

### RETIREMENT BENEFITS

. . . . .

*Section 5.* For purposes of this Article VI, a participant hereunder shall receive and be credited with "credited service" as that term is used herein in the amounts as specified in this Section 5 if he shall have been employed by the COMPANY [defined as Glendenning Motorways, Inc.] during any fiscal year for the number of hours as follows:

---

3. There was a separate, collectively bargained pension plan covering Glendenning's union or contract employees.

4. Wilson was thus covered by the collectively bargained pension plan in force during her Moland years and continuing into her Glendenning years.

5. Stuntebeck later became executive vice president of Glendenning, second in command only to William Glendenning. Stuntebeck deposition at 6.

6. Stuntebeck was actively engaged in discussions with the attorney who drafted the Plan

for Glendenning. Stuntebeck deposition at 28–29.

7. The Plan was restated by amendment on December 30, 1977, effective as of December 1, 1976; the purpose of the amendment was to bring the Plan into compliance with ERISA. Unlike the original plan, the restated version explicitly excluded service with a predecessor employer from its definition of "credited service." This case, however, must be decided under the original Plan, which provided that no amendment of it could deprive participants of benefits due them with respect to contributions made or to be made by Glendenning under its terms.

| Hours of Employment | Credited Service |
|---|---|
| 2,000 or more | 1 year |
| More than 1,500 but less than 2,000 | ¾ of a year |
| More than 1,000 but less than 1,500 | ½ of a year |
| More than 500 but less than 1,000 | ¼ of a year |

The possibility that hours of employment by a predecessor employer like Moland might be counted as hours of employment by Glendenning was not excluded by this or any other provision of the Plan. On the contrary, as early as March 24, 1969, Stuntebeck explained to one of the plaintiffs, Oscar Landro, "that we would get—Moland employees would get full credit from the starting date with the initial company or any other company that was purchased by Glendenning." [8] As we shall see, this interpretation of the Plan was consistently followed by Glendenning, at least as to former Moland employees, in both word and deed, until 1977 when it was suddenly claimed all to have been a mistake.

The Plan was amended for the first time on November 21, 1969, by the addition of the following definition as Art. III, section 3, subsection (1):

"Years of credited service" or "credited service" shall mean that period of an employee's employment by the Company during which contributions to other deferred compensation, pension or retirement plans (other than life insurance policies) of any kind whatsoever, whether individually or pursuant to a collective bargaining agreement, are not made to or for the benefit of such employee.

This definition obviously did not resolve the uncertainty already noted in the terms of the Plan, as to whether employment by a predecessor employer would count as employment by Glendenning for the purpose of computing years of credited service. On the other hand, the definition does appear to exclude from credited service periods of employment, whether by Glendenning or a predecessor, during which contributions were made on behalf of an employee to another pension plan; and such contributions were made for many years by Moland, under its own plan for non-union employees, on behalf of Landro, Shafranski, Benna and Schultz. However, by the time that the Glendenning Plan came into existence, the Moland plan covering these four appellees had been liquidated and its assets distributed; [9] and it was open to the Advisory Committee to interpret the above exclusion in such a way that it did not apply to periods during which contributions were made to a pension plan no longer in existence, and from which employees could therefore expect no future benefits. [10] Such a construction is consistent with the words and actions of Glendenning and its Advisory Committee.

Glendenning began making substantial contributions toward the funding of the Plan in 1969 and taking tax deductions therefor. [11] The amounts of these contributions were based in part on the assumption that credit would be given to appellees for their years of service with Moland. Also beginning in 1969 appellees began receiving "Annual Reviews" of the benefits they could expect to receive under the Plan upon reaching their normal retirement dates. These documents (later called "Annual Statements") were prepared by a third party Plan administrator on the basis of information furnished by Glendenning. They showed among other things the employees' years of credited service, and an estimated monthly pension amount based on those years of service. The Annual Reviews sent

8. Trial transcript at 19 (testimony of Oscar Landro). We find no need to rely on plaintiffs' exhibit 4, Landro's memorandum of his conversation with Stuntebeck, in finding no clear error in the district court's finding that the conversation took place substantially as reported by Landro.

9. Landro, Shafranski, Benna and Schultz each received his share of this distribution.

10. This construction of the Plan obviously does not aid appellee Wilson. *But see* part III of this opinion, *infra*.

11. The Plan was designed to meet the requirements of section 401(a) of the Internal Revenue Code, making the Glendenning Retirement Plan and Trust exempt from taxation under section 501(a) of the Code and Glendenning's contributions deductible under section 404(a). *See* 26 U.S.C. §§ 401, 404, and 501.

to appellees consistently included their Moland years as years of credited service and to compute the estimated monthly pension amount at retirement. At the very least, the Annual Reviews must have confirmed in the minds of appellees their increasingly well-founded belief that they were to be credited under the terms of the Plan for their Moland years.

On December 20, 1970, an informational meeting was held in St. Paul, Minnesota, during which the Plan (as well as other Glendenning benefit programs) was explained to eligible employees by Stuntebeck. William Glendenning was present at the meeting. A small booklet was distributed to the employees that included a section entitled "Your Pension Plan." [12] Paragraph 8 of that section read as follows:

> 8. What are Years of Credited Service?
> You receive a Year of Credited Service for each full year that you work between your initial employment and your retirement. You will receive partial credit for partial years worked according to the following schedule:

| Hours of Employment | Accredited Service |
| --- | --- |
| 2000 or more | 1 Year |
| More than 1500 but less than 2000 | ¾ Year |
| More than 1000 but less than 1500 | ½ Year |
| More than 500 but less than 1000 | ¼ Year |

It will be observed that this paragraph was ambiguous in much the manner of Art. VI section 5 and Art. III section 3 subsection (1) of the Plan itself: it was not clear from the language of the paragraph whether the phrase "initial employment" meant the date when an employee first started to work for Glendenning itself, or the date when he or she first started to work for a predecessor employer like Moland. According to appellees, this question was specifically raised at the informational meeting, and Stuntebeck then again confirmed that they would be

credited for their years of service with Moland. As Shafranski testified:

> A . . . So that question was in my mind. So I tried to obtain the attention of Mr. Stuntebeck who chaired the meeting and raised my hand, and finally was acknowledged, and I asked him this question:
>
> I says, "Mr. Stuntebeck, how will our prior years with Glendenning be treated under this Plan?"
>
> Q Excuse me. You said Glendenning?
>
> A I mean with Moland Brothers, sorry. And he pondered a moment[,] looked around and he answered me. He said, "Your years will be treated the same as Glendenning years." I was satisfied so I sat down.

Trial transcript at 110. We recognize that there is conflict in the testimony about what transpired at the informational meeting. William Glendenning testified as follows:

> A I did not hear a question or an answer at any time during that meeting that would indicate that Moland time was credited in a plan for past service.
>
> Q If you had heard so would you have said something?
>
> A Well, Vic [Stuntebeck] wouldn't make that statement, and if he had made a statement I'd certainly have to correct him. It's never been the intent to do that.

Trial transcript at 349. However, each of the other appellees [13] corroborated Shafranski's testimony on this point; and the district court credited their testimony rather than Mr. Glendenning's. We do not find that the district court erred in finding that at the meeting

> Stuntebeck was asked by a former Moland employee whether credit would be

---

12. We recognize that this section of the booklet included the following caveat:

> This section gives only the highlights of the plan and is a summary of the formal trust agreement, which you may examine in the Personnel Office. If there is any disagreement between this section and the documents

involved, the trust agreement will control the actions of the trustees.

13. Including Wilson, who by this time had become a non-contract employee, who was therefore eligible to participate in the Plan, and who attended the informational meeting of December 20, 1970.

given for the Moland years. Stuntebeck replied in the affirmative. The other Committee member, Mr. Glendenning, also was present and there is no indication that he disagreed at that time with Stuntebeck's answer. Moreover, it appears reasonably certain that Stuntebeck's answer was made with some aforethought, since he had been asked the same question by another Moland employee, Mr. Landro, several months earlier and gave the same response.

After the informational meeting, Glendenning's contributions to the Plan fund continued to be based in part on the assumption that credit would be given to appellees for their years of service with Moland, and appellees continued until 1974 to receive "Annual Statements" indicating that they were being credited for their Moland years.[14]

The first former Moland employee to retire after the Plan was instituted was William Billstein, who took early retirement in 1972. As per the terms of the Plan, the Advisory Committee, in a document signed by Stuntebeck for the Committee, computed and certified to the Trustee the amount and kind of benefits payable to Billstein under the Plan; Billstein thereafter began receiving monthly pension benefits based on years worked with both Moland and Glendenning. The first check sent to Billstein was seen and approved by William Glendenning.

The next former Moland employee to apply for pension benefits under the Plan was Oscar Landro, who retired in 1977. It was not until his retirement and application for benefits that Glendenning for the first time took the position that appellees' years of service with Moland were not to be counted as years of credited service under the Plan. Glendenning then maintained that it had never intended to include Moland years; and that all indications to the contrary during the previous eight years (of which more could be recounted) had been based on certain clerical errors [15] and what it calls "unauthorized" statements by Stuntebeck. On the strength of these allegations, Glendenning permitted the Trustee to pay benefits to Landro only on the basis of his years with Glendenning itself; and it required the Trustee to reduce Billstein's monthly benefits so as to reflect only years worked for Glendenning.

This suit was brought on August 23, 1977, by Billstein and Landro. Appellants have since settled with Billstein, acknowledging that because he took early retirement in reliance on the representations that his pension would be based on his years of service with both Moland and Glendenning, they are estopped from denying him the full benefits he claims. The four other appellees joined the suit on January 29, 1979; all ceased working for Glendenning between 1976 and 1978. Appellants continue to deny that they or Landro are entitled to have their pension benefits computed on the ba-

---

14. Appellee Wilson too received at least one Annual Statement indicating that she was being credited under the Plan with both her Moland and Glendenning years, including her years as a contract employee.

The Annual Statements of prospective pension benefits were apparently discontinued after 1974. We again recognize that the Annual Statements issued from 1971 to 1974 included the following caveat:

We have attempted to provide you with an accurate report. You should appreciate, however, that errors may occur and we cannot assume any responsibility for them. Also, this is only a projected summary of benefits under the plan. The actual benefits are subject to *all* of the terms and conditions of the Plan and/or Trust. Thus, your right to

receive benefits stated herein may be subject to certain conditions not fulfilled.

The Annual Reviews issued in 1969 and 1970 had said:

Benefits are determined only in accordance with and subject to the Provisions of the Plan and Trust Agreement.

15. Appellants explain that the data they submitted to the third party that was administering the Plan for them showed for each employee both the date of employment with any predecessor employer and the date of employment with Glendenning. Some benefits funded by Glendenning were based on one date, others were based on the other. Appellants claim that the third party erroneously calculated the pension benefits of the former Moland employees on the basis of the wrong date.

sis of both their Moland and Glendenning years of service.

## II.

Appellees have advanced various theories, both here and in the district court, in support of their claim to benefits based on both their Moland and Glendenning years, including the theory of promissory estoppel and the theory that the oral representations of Stuntebeck and the actions of Glendenning constituted an "amendment in fact" of the Plan. *Cf. Hardy v. H. K. Porter Co., Inc.*, 417 F.Supp. 1175, 1184–85 (E.D.Pa. 1976), *aff'd in part, rev'd in part mem.*, 562 F.2d 42 (3rd Cir. 1977) (aff'd as to liability, rev'd as to measure of damages). Appellants argue in opposition to these theories that the remaining appellees, unlike Billstein, have failed to prove that they relied to their detriment on the various representations that they would be credited with their Moland years; and that the Plan, providing as it did for its own amendment, cannot have been amended save in accordance with its own terms. Except in considering the special case of Margarete Wilson, we see no need to discuss these theories, since we are persuaded that as to the other appellees this case was properly decided by the district court on the basis of well established principles governing the construction of such pension plans as the one here in question.

## A.

There is to begin with some question of what law should be applied in the case. On the one hand, federal jurisdiction is predicated on the civil enforcement provision of ERISA, 29 U.S.C. § 1132. The preemption provision of ERISA, 29 U.S.C. § 1144(a), provides that:

> (a) Except as provided in subsection (b) of this section, the provisions of this subchapter [29 U.S.C. §§ 1001–1144, "Protection of Employee Benefit Rights"] and subchapter III of this chapter [29 U.S.C. §§ 1301–1381, "Plan Termination Insurance"] shall supersede any and all State

16. Including decisional law, *see* 29 U.S.C. § 1144(c)(1).

> Laws [16] insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975.

This language has been held to be of very broad application:

> The legislative history [of ERISA] manifests that Congress intended to preempt all state laws that *relate* to employee benefit plans and not just state laws which purport to regulate an area expressly covered by ERISA.

*Wadsworth v. Whaland*, 562 F.2d 70, 77 (1st Cir. 1977) (Lay, J., sitting by designation), *cert. denied*, 435 U.S. 980, 98 S.Ct. 1630, 56 L.Ed.2d 72 (1978). The legislative history of the Act demonstrates that in order to fill the gaps left by ERISA's express provisions, Congress "intended that a body of Federal substantive law will be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans," 120 Cong.Rec. 29942 (1974) (remarks of Senator Javits), in much the same way as the federal courts have long fashioned federal common law under section 301 of the Labor Management Relations Act of 1974. *See* House Conf. Rep.No.93–1280, the Joint Explanatory Statement of the Committee of Conference on ERISA, *reprinted in* [1974] U.S.Code Cong. & Admin.News 5038, 5107 (actions under ERISA to enforce benefit rights under a covered plan or to recover benefits under the plan, whether brought in federal or state courts, "are to be regarded as arising under the laws of the United States in similar fashion to those brought under section 301 of the Labor-Management Relations Act of 1974."); *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) (federal common law under § 301 of the LMRA). We might, therefore, seek to discern and apply "federal" principles in the decision of this case.

On the other hand, 29 U.S.C. § 1144(b)(1) provides that the preemption

provision of ERISA "shall not apply with respect to any cause of action which arose, or any act or omission which occurred, before January 1, 1975."

> [T]hat clause was apparently intended to permit courts to apply state law, even if the cause of action accrued after January 1, 1975 [as here], in cases where that result most fairly accommodates the interests of all affected parties—the beneficiaries, participants, and fiduciaries of and contributors to ERISA trusts. Courts must try to phase ERISA in as rapidly as possible without judging the conduct of affected persons by standards different from those which applied when they acted.

*Bacon v. Wong*, 445 F.Supp. 1189, 1192 (N.D.Cal.1978), *quoted with approval in Winer v. Edison Bros. Stores Pension Plan*, 593 F.2d 307, 313 (8th Cir. 1979). In this case the "acts or omissions" most centrally in question—the adoption of the Plan by Glendenning in 1968 and its first amendment in 1969; the absence from the Plan even as thus amended of any express provision relating to credit for years of service with predecessor employers; and the course of conduct by Glendenning and its officials that has given color to appellees' claims to credit for their years of service with Moland—all occurred before January 1, 1975. Furthermore, the Plan itself provided that "[t]his agreement and the Trust established hereunder shall be construed, administered and governed in all respects under the laws of the State of Minnesota." Art. XXII, section 1. These considerations lead us to believe that the interests of all the parties will most fairly be accommodated if we apply Minnesota law in this case, as we are authorized and perhaps even required to do by 29 U.S.C. § 1144(b)(1). In any event, we find the law of Minnesota to be in accord with the general principles of the law of contracts as applied to private welfare and pension plans to which we would look as a source for federal law on the questions involved in this case.

### B.

■ The district court in effect analyzed the case as presenting a two-step problem in the construction of the Plan considered as a contract between Glendenning and its participating non-union employees. It first considered whether the Plan was ambiguous on the question whether appellees should be credited for their Moland years, finding, from evidence extrinsic to the Plan, that it was so as a matter of fact; and it next considered whether the Plan was rightly construed as crediting appellees for their Moland years, finding, again largely from extrinsic evidence and as a matter of fact, that "[t]he language of the plan and the actions of the Advisory Committee and Glendenning Motorways indicate the plan was intended to and did give credit for the years worked at Moland." We are in agreement with this approach to the case as a matter of the legal analysis of the problem, and do not find that any of the factual determinations made by the district court are clearly erroneous. *See* Rule 52(a), F.R. Civ.P.

■ 1. Under Minnesota law the Plan as administered would unquestionably be treated as having given rise to obligations that Glendenning was contractually required to perform.

> Where an employer represents in a written document distributed to employees that an employee will receive benefit payments in certain specified circumstances as an incentive for continued service, those benefits are a part of the employee's compensation which the employer is contractually obligated to pay. These benefits do not become gratuities simply because employees do not contribute to the funds from which they are paid. Since the benefits are contractual obligations, a trial court may properly address any underlying factual disputes between the parties in determining whether an employer decision to deny benefits is a breach of contract.

*Melin v. Northwestern Bell Tel. Co.*, 266 N.W.2d 183, 186 (Minn.1978); *see also Foss v. Mahal*, 304 Minn. 350, 230 N.W.2d 604 (1975); *Rakness v. Swift & Co.*, 275 Minn. 451, 147 N.W.2d 567 and 286 Minn. 74, 175

N.W.2d 429 (1966 and 1970); *Lucas v. Seagrave Corp.*, 277 F.Supp. 338 (D.Minn.1967). This view is in accord with that adopted in many states, *see, e. g., Hoefel v. Atlas Tack Corp.*, 581 F.2d 1, 4–5 (1st Cir. 1978), *cert. denied*, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979) (Massachusetts law) and authorities cited therein; and appellants do not dispute it. We do not think that anything in ERISA vitiates this contractual view of pension plans unilaterally adopted by an employer, any more than it vitiates a similar view of plans whose terms are to some extent collectively bargained.

2. What appellants mainly dispute is the district court's finding that the Plan was silent or ambiguous on the question of credit for years of service with a predecessor employer like Moland. They argue that the Plan clearly and plainly allowed "credited service" only for periods of employment by Glendenning itself; that no extrinsic evidence was necessary to determine the meaning of the Plan or the intent of the parties on this point; and that the district court erred by considering parol and other extrinsic evidence to the illegitimate end of varying the terms and enlarging the benefits conferred in the Plan.

The answer to this argument is the one we have adumbrated in our recitation of the facts, *supra*. While it is true that the Plan by its terms allowed credited service only for periods of "employment by Glendenning," it nowhere excluded the possibility that periods of employment by predecessor employers like Moland were meant to be included within the definition of "credited service" *as* periods of "employment by Glendenning." The district court properly considered evidence extrinsic to the Plan itself for the purpose of determining whether it was open to this construction —whether, in effect, the Plan was latently ambiguous on this point. *See* Restatement (Second) of Contracts, § 238, Comment *b* (Tent. Drafts Nos. 1–7), *quoted with approval* in *Anderson v. Kammeier*, 262 N.W.2d 366, 370 n.2 (Minn.1977):

It is sometimes said that extrinsic evidence cannot change the plain meaning of a writing, but meaning can almost never be plain except in a context. * * Any determination of meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties. * * *

The extrinsic evidence considered by the district court demonstrated that in fact the Plan *could* be construed as including periods of service with Moland as periods of service with Glendenning: this, the court found, was precisely the construction put on it by Stuntebeck, who was a member of the Advisory Committee charged with administering and interpreting the Plan, who was familiar with its terms and the history of its adoption, and who, in his answer to Shafranski's question, replied, "Your years will be treated the same as Glendenning years." The district court committed no error in finding the Plan to be ambiguous or "silent" on the question whether appellees were to be credited for their Moland years.

3. Having found the plan ambiguous, the district court went on to consider the evidence bearing on its right construction. Extrinsic evidence was again properly considered for this purpose. *Flynn v. Sawyer*, 272 N.W.2d 904 (Minn.1978); *Anderson v. Kammeier, supra.* Since the evidence was conflicting, the district court was required to determine the meaning of the relevant terms of the Plan as a matter of fact:

A question of interpretation of an integrated agreement [like the Plan] is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence. Otherwise a question of interpretation of an integrated agreement is to be determined as a question of law.

Restatement (Second) of Contracts, § 238(2) (Tent. Drafts Nos. 1–7); *see also Melin v. Northwestern Bell Tel. Co., supra,* 266 N.W.2d at 186.

■ We have carefully reviewed the record on appeal, and we are not left with the "definite and firm conviction that a mistake [was] committed" by the district court in finding that the Plan was intended to and did give appellees Landro, Shafranski, Benna and Schultz credit for the years they worked for Moland. *Cf. United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948) (test for clear error). We see no need to review the evidence again here. We shall only say that we are reinforced in our conclusion by the principle that since the Plan was a unilateral undertaking of Glendenning's whose terms were under the exclusive control of Glendenning, it partook of the nature of an adhesion contract which must be construed strictly against its drafters:

> Where one of the parties draws a contract and the other must accept or reject but cannot vary the terms, the burden is upon the party drawing the contract to make the meaning plain. Where meaning is thus uncertain, as it is in the contracts here involved, the ambiguities and doubts must be resolved against the party who prepared the contract.

*Weum v. Mutual Benefit Health & Acc. Ass'n*, 237 Minn. 89, 54 N.W.2d 20, 29 (1952). *Cf. Hoefel v. Atlas Tack Corp., supra*, 581 F.2d at 7; *Gladden v. Pargas, Inc., of Waldorf, Md.*, 575 F.2d 1091, 1094 (4th Cir. 1978); *Hudson v. John Hancock Mutual Life Ins. Co.*, 314 F.2d 16, 21 (8th Cir. 1963); *Shaw v. Kruidenier*, 470 F.Supp. 1375, 1382 (S.D.Iowa 1975), *aff'd mem.* (8th Cir. 1980). The district court's construction of the Plan is consistent with this principle.

### C.

Given the view we have taken of this case, many of appellants' arguments and authorities become irrelevant. Thus, for example, the argument that the Minnesota statute of frauds would bar recognition of an oral amendment to the Plan has nothing to do with the case, since no finding has been made that the Plan was amended in favor of appellees; it has merely been construed in their favor by the district court.

*Compare Schlansky v. United Merchants and Manufacturers, Inc.*, 443 F.Supp. 1054 (S.D.N.Y.1977) (applying the New York statute of frauds to bar recognition of an alleged oral agreement to give pension credit for years of service with a predecessor employer). Similarly, the cases cited by appellants holding that the terms of a pension plan itself will control over the terms of documents purporting to explain the plan if the latter refer to the plan as controlling (*see* notes 12 and 14, *supra*) are irrelevant here because it is the pension plan itself that has been found ambiguous and construed in favor of appellees; the other documents relied on by appellees merely support the finding of the Plan's ambiguity and the construction imposed on it by the district court. *Compare, e. g., Anthony v. Ryder Truck Lines, Inc.*, 466 F.Supp. 1287, 1292–93 (E.D.Pa.1979), *rev'd on other grounds*, 611 F.2d 944 (3rd Cir. 1979). Finally, we are not affected by the argument that although the Plan provided that interpretive decisions of the Advisory Committee would be binding and conclusive on all parties, Stuntebeck's interpretive statements could not be binding because he "was merely one member of the Advisory Committee; and there is nothing in the record to show that any formal action of the Advisory Committee interpreting the Plan in the sense adopted by the Court ever occurred." Stuntebeck's statements need not be considered to be *conclusive* evidence of the meaning of the Plan; it is enough that they are evidence of it which, together with the other evidence in the record, gives substantial support to the finding of the district court that appellees Landro, Shafranski, Benna and Schultz were meant to be credited under the Plan with their Moland years.

### III.

Unlike the other appellees, Margarete Wilson was a union or contract employee with Moland from 1958 to 1963, and with Glendenning from 1963 to 1969; she was thus covered under the collectively bargained pension plan that was in force during her Moland years and that continued

unabated throughout her years with Glendenning. Contributions were made on her behalf to that plan. Recall that the Plan here in question was amended in 1969, to exclude from the definition of "credited service" periods during which contributions were made on behalf of an employee to another (ongoing) pension plan. *See* p. 1348, *supra*. It appears, therefore, that unlike the other appellees, Wilson is not aided by the construction imposed on the Plan by the district court. However, the district court found that:

> In 1969 [Wilson] was asked by Mr. Stuntebeck, on behalf of Glendenning, to become a non-contract employee. She was hesitant to do so because she was within months of becoming a vested participant in her union pension plan. To allay this concern, Stuntebeck promised that her prior years as a union employee, both at Moland and at Glendenning, would be credited to her under Glendenning's pension plan for non-contract employees, the plan at issue here. Under those conditions, Ms. Wilson accepted the non-contract position, but she has now been informed by Glendenning that her Moland years will not be credited to her.

■ Wilson clearly presents a special case. Although the district court did not explicitly find in her favor on the basis of the doctrine of promissory estoppel, it did make findings sufficient to support the judgment entered in her favor on that basis: the court found that a promise was made to her by Stuntebeck on behalf of Glendenning, which Stuntebeck intended to induce action on the part of Wilson and which did in fact induce such action. Despite appellants' protestations to the contrary, we see no clear error in these findings; and we conclude that injustice can be avoided only by enforcement of Stuntebeck's promise to Wilson. *See United Elec. Corp. v. All Serv. Elec., Inc.*, 256 N.W.2d 92, 95–96 (Minn.1977), adopting § 90 of the Restatement (Second) of Contracts, which provides that:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy for breach may be limited as justice requires.

We therefore affirm the judgment of the district court in favor of Wilson on grounds of promissory estoppel.[17] The issue was briefed and argued for us by the parties. We note that grounds other than those explicitly adopted by the district court, if adequately founded in the record, may provide a proper legal basis for affirmance of the judgment. *Kuehn v. Garcia*, 608 F.2d 1143, 1146 (8th Cir. 1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 1340, 63 L.Ed.2d 777 (1980).

## IV.

29 U.S.C. § 1132(g) provides that:

> (g) In any action under this subchapter by a participant, beneficiary, or fiduciary [as authorized generally by § 1132], the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

On appellees' post-judgment motion, the district court awarded them $10,125 in attorney's fees under this provision. The court determined the amount of the award on the basis of the standards articulated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974) and approved by this Court in *Wharton v. Knefel*, 562 F.2d 550, 558 n.37 (8th Cir. 1977). The award was assessed against the em-

---

17. The judgment orders appellants to credit appellees, including Wilson, only with their Moland years. There is no question that all appellees except Wilson are entitled to credit under the Plan for all their Glendenning years; there appears to be some question, however, whether Wilson should be credited for the years she worked for Glendenning as a contract employee. *See* appellants' brief at 28–29; appellant's reply brief at 2. While Wilson requested in her complaint that the district court order appellants to give her credit for all of her Moland *and* Glendenning years, she has not cross-appealed from the judgment, and we are therefore powerless to determine whether she should be credited for the years she worked for Glendenning as a contract employee.

ployer defendant only, since "it was primarily because of the employer's actions that plaintiffs were required to seek redress in court;" the district court found that it would be "inappropriate to require the defendant Plan and Trust to pay such fees, since the plaintiffs' action has not benefited the majority of the plan participants and those participants have not been culpable in any manner. . . ." Glendenning, the employer defendant, has appealed this ruling, arguing that because there has been no showing that it acted in bad faith in denying appellees credit for their Moland years, the district court abused its discretion in assessing appellees' attorney's fees against it. Since 29 U.S.C. § 1132(g) clearly commits the question of allowance of attorney's fees in suits under § 1132 to the discretion of the district court, we will of course reverse that court's determination of the question only for abuse of discretion. We find none here.

One reason for permitting prevailing § 1132 plaintiffs[18] to recover attorney's fees under § 1132(g), even if no bad faith on the part of the defendants is shown, is the one given in *Baeten v. Van Ess*, 474 F.Supp. 1324, 1332 (E.D.Wis.1979): under pre-ERISA American common law, the courts *already* had the discretion to award attorney's fees against a losing party who had acted in bad faith, *Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975); and there is no reason to believe that by including § 1132(g) in the text of ERISA Congress merely intended to codify this pre-existing common law rule. *Cf. Newman v. Piggie Park Enterprises*, 390 U.S. 400, 402 n. 4, 88 S.Ct. 964, 966 n. 4, 19 L.Ed.2d 1263 (1968); *Eaves v. Penn*, 587 F.2d 453, 464–65

(10th Cir. 1978). There is indeed a presumption against construing a statute in such a way as to render it superfluous. *Jackson v. Kelley*, 557 F.2d 735, 740 (10th Cir. 1977).

■ Beyond that somewhat technical point, however, we think that § 1132(g), like the rest of ERISA, is remedial legislation that should be construed liberally in favor of those persons it was meant to benefit and protect, namely, participants in and beneficiaries under covered pension and welfare plans; persons, in short, like appellees, who are specifically permitted by § 1132(a) and (f) to sue in the federal courts to enforce their rights under their pension plans. Like the provisions authorizing attorney's fees awards in suits under other federal remedial legislation, § 1132(g) should be read broadly to mean that a plan participant or beneficiary, if he prevails in his suit under § 1132 to enforce his rights under his plan, "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Cf. Newman, supra*, 390 U.S. at 400, 88 S.Ct. at 966 (construing the authorization for attorney's fees awards in Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a–3(b)); *Wharton, supra*, 562 F.2d at 557 (construing the Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988 (as amended)). The mere absence of bad faith on the part of the losing defendant is not such a "special circumstance;" nor has Glendenning demonstrated that any other such circumstances exist in this case.[19] It follows that the district did not abuse its discretion in awarding attorney's fees to appellees.

The judgment of the district court is affirmed, as is its award of attorney's fees to appellees.

---

18. We emphasize that we need and do decide here only whether *prevailing* § 1132 *plaintiffs* may be awarded attorney's fees under § 1132(g) absent a showing of their opponents' bad faith. We do not consider whether prevailing defendants may be awarded their attorney's fees absent some similar showing; nor do we consider the circumstances, if any, under which § 1132 plaintiffs might justifiably recover their attorney's fees even if they do not prevail on the merits of their claims.

19. The burden of proof of special circumstances that would render unjust an award of attorney's fees to prevailing § 1132 plaintiffs should be on the losing defendant. *Cf. Williams v. Miller*, 620 F.2d 199 (8th Cir. 1980); *Mid-Hudson Legal Services, Inc. v. G & U, Inc.*, 578 F.2d 34, 38 (2d Cir. 1978).

HENLEY, Circuit Judge, dissenting.

The majority's approval of the district court's conclusion that the " 'language of the plan and the actions of the Advisory Committee and Glendenning Motorways indicate the plan was intended to and did give credit for the years worked at Moland' ", *ante* at 1352, is troubling and I cannot accept it. The majority concedes, as it must, that the "Plan by its terms allowed credited service only for periods of 'employment by Glendenning' ", *ante* at 1353. But despite this language, the majority nonetheless holds that the Plan is ambiguous because it did not exclude the possibility that an employee might be credited for service with a predecessor company such as Moland.

The court should be reluctant to find a contract ambiguous solely on the basis of what it does not include. The provision at issue contained clear language that credit would be given only for the periods of employment with Glendenning. We are not at liberty to rewrite the contract.

It appears that the majority finds ambiguity in the Plan largely because of promissory actions and statements by company officials. If so, the theory upon which relief is granted in fact may be characterized as one of promissory estoppel even though the majority opinion avows disregard of promissory estoppel except with respect to Mrs. Wilson.

While I am unwilling to grant relief on the basis of any alleged ambiguity in the contract, it may be that the appellees-employees, including Mrs. Wilson, are in fact entitled to credit under the pension plan on the grounds of promissory estoppel. Because the district court made no findings on this issue, I would reverse and remand the case for further consideration of the question whether, under some theory of promissory estoppel, the appellees-employees should be credited for their period of service with Moland.

In the circumstances, I find an award of attorney's fees to be premature although I do not disagree in principle with the majority's views concerning such fees.