753 F.Supp. 284 (1991)
Sheila J. COCHRAN, Lillian L. Bender, and Brenda M. Hegger, Plaintiffs,
v.
AT & T TECHNOLOGIES, INC., and American Telephone and Telegraph Company, Defendants.
No. 88-1416-C-5.
United States District Court, E.D. Missouri, E.D.
January 3, 1991.
Belz & Beckemeier, P.C., Mark Belz, St. Louis, Mo., for plaintiffs.
Peper, Martin, Jensen, Maichel & Hetlage, Richard E. Jaudes, Clifford A. Godiner, St. Louis, Mo., for defendants.

MEMORANDUM
LIMBAUGH, District Judge.
Defendant American Telephone and Telegraph Co. is a New York Corporation authorized to do business and actually doing business in the State of Missouri. Defendant AT & T Technologies, Inc. is a wholly owned subsidiary of American Telephone and Telegraph Co. Plaintiffs Sheila J. Cochran, Lillian L. Bender, and Brenda M. Hegger are former employees of AT & T Technologies, Inc.[1]
*285 Plaintiffs filed a petition in the Circuit Court of St. Louis, State of Missouri in which they alleged that defendants breached an agreement with plaintiffs regarding separation benefits. The action was removed to federal court pursuant to 28 U.S.C. § 1441 on the ground that plaintiffs' claims were preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. ("ERISA"). Plaintiffs subsequently filed a one count first amended complaint which essentially rephrased their claims as a violation of the ERISA.
This action was tried before the Court on October 1, 1990 and October 2, 1990. The Court, having considered the pleadings, testimony of witnesses, and documents admitted into evidence hereby makes the following findings of fact and conclusions of law as required by Fed.R.Civ.P. 52.

I. Findings of Fact
Plaintiffs were employed by AT & T Technologies, Inc. at its facility at 1111 Woods Mill Road in Ballwin, Missouri ("Ballwin facility"). Plaintiff Lillian Bender was a facilities/switchboard operator from March 5, 1984 to October 30, 1987. Plaintiff Sheila Cochran was a clerk who worked for AT & T for a total of twelve years. Ms. Cochran's last date of employment with AT & T was October 30, 1987. Plaintiff Brenda Hegger was a records clerk from September, 1984 to October 30, 1987. Each plaintiff was classified as an entry level "M10" employee. Each plaintiff worked weekdays (Monday through Friday) on the daytime shift.
On January 1, 1984 the court-ordered divestiture of AT & T became effective. The divestiture forced AT & T, including its Ballwin facility, to reduce substantially the size of its work force. In November, 1984 AT & T laid off approximately 250 employees at the Ballwin facility because of lack of work. In August, 1986 AT & T laid off approximately 80 additional employees at the Ballwin facility. In spring, 1987 AT & T initiated a consolidation in Atlanta, Georgia of financial operations that had been performed at several locations, including the Ballwin facility. Over 700 employees at the Ballwin facility were to be effected by the consolidation.
On March 20, 1987 AT & T held meetings with employees at its Ballwin Facility and announced the consolidation of financial operations in Atlanta. AT & T's primary spokesperson at these meetings was Robert Henson, the personnel supervisor at the Ballwin facility. Each plaintiff attended one of the March 20, 1987 meetings. At these meetings the employees were asked to complete a non-binding preference survey stating whether they currently expected to relocate to Atlanta or to take a voluntary separation. All three plaintiffs chose "to be considered for placement on another job at [the Ballwin] location in accordance with applicable movement of personnel procedures."
AT & T called the personnel changes necessitated by the consolidation a "force adjustment."[2] AT & T determined that October 30, 1987 would be the date on which the force adjustment would be completed. Throughout the summer of 1987 employees who desired to relocate to Atlanta were transferred from the Ballwin facility. AT & T then assigned the jobs remaining at the Ballwin facility to employees who had not yet relocated to Atlanta or voluntarily terminated. Most of these assignments, made in order of grade, appraisal and seniority, were given to the higher paid, non-entry level employees. Many of the reassigned employees received a reduction in pay and a demotion.
On October 2, 1987 there remained 117 employees for which there would be no work at the Ballwin facility on October 30, 1987. On October 2, 1987 these employees, including plaintiffs, received notices that they were "scheduled to be laid off" on October 30, 1987. The notices stated:
As you know the consolidation of the St. Louis Financial Operations Center to Atlanta, Georgia, created a surplus condition which necessitates an adjustment to the remaining work force. Consequently, I regretfully inform you that you are *286 scheduled to be laid off. Your last day of employment will be October 30, 1987. Please plan to attend an information meeting on Monday, October 5, 1987, at 9:00 a.m. in the Auditorium. At that time, you will be advised of your recall rights, the provisions of the Employment Opportunities Review System (EORS), benefit plans, layoff allowance, and other layoff provisions available to you.
AT & T offered the employees scheduled to be laid off the options of transferring to Atlanta or voluntarily terminating their employment. On October 2, 1987 AT & T established deadlines for exercising these options. The deadline for opting to move to Atlanta was October 15, 1987; the deadline for electing a voluntary separation was October 16, 1987. If an employee accepted a transfer to Atlanta, AT & T would relocate her and she would not suffer a separation from AT & T. If an employee accepted a voluntary separation by October 15, she would receive severance benefits in a lump sum and have no recall rights. If an employee forewent relocation to Atlanta and voluntary separation and was involuntarily laid off, she would receive severance benefits in a lump sum and would possess recall rights. The employees were warned that if they failed to elect either option they would be subject to AT & T's "normal force adjustment procedures".[3]
All three plaintiffs attended the October 5, 1987 meeting. The October 5, 1987 meeting was videotaped, and portions of the videotape were played for the Court. Again, Mr. Henson was the primary spokesperson for AT & T. During the meeting Mr. Henson stated:
[You must go into the next two weeks making decisions based upon the October 2, 1987 letter informing you that you are scheduled to be laid off. Do not hope you are a lucky person who will get a job because someone took a voluntary separation.][4]
[W]e hope that everybody in this room gets an opportunity to be placed somewhere. There's no guarantee of that, but we're trying to do everything we can to find out about any jobs.
[W]e may have people who have been downgraded who may not want to stay with the company. We have people who may decide to go to Atlanta in lieu of taking a downgrade here. All that may change certain individuals' status.
[I]f you make your decision that you're just going to wait and get laid off and something changes and you don't get laid off, then that's a plus for you.
[S]hould someone who's still going to have a job decide to take a voluntary [separation], that may very well save somebody who's going to be laid off.
[T]he thing's fluid and changing, so, you know, situations will change.
[T]he second handout is the form you will need to fill out that tells us how you would like your severance pay should you not get a job between now and October 30, and you have to go on severance pay.
Plaintiffs elected neither relocation nor voluntary separation by their respective deadlines.
On October 2, 1987 five AT & T employees were reassigned to typist clerk jobs in a unit at the Ballwin facility called the Regional Technical Assistance Center ("RTAC").[5] The RTAC clerk typist job is classified as an entry level M10 position. The RTAC clerk performs general typing duties and routes calls concerning problems in central office telecommunication systems to the appropriate engineer. The *287 RTAC is open 24 hours per day, 7 days per week.
One of the employees reassigned to the RTAC clerk typist position elected a voluntary separation rather than taking a demotion. Therefore, one employee who was scheduled to be laid off on October 30, 1987 could be reassigned to the position of RTAC clerk typist. The hours of the available position were 4:00 p.m.-12:00 a.m., Thursday through Monday. Although the base salary of the RTAC job was the same as other M10 entry level positions, the RTAC clerk would receive a 10% bonus for working at night, a 20% bonus for working weekend nights, and a 150% bonus for working holidays.
Plaintiff Brenda Hegger was first employee reassigned to the position of RTAC clerk typist. On or around October 21, 1987 Ms. Hegger received the assignment to be effective November 2, 1990. Ms. Hegger refused the assignment due to the evening hours and weekend work required. Later, Ms. Hegger was informed that her refusal of the assignment was considered a voluntary resignation. Ms. Hegger, however, did not receive severance benefits offered for a voluntary separation because she had not elected a voluntary separation by the October 16, 1987 deadline.
Plaintiff Lillian Bender was the second employee reassigned to the position of RTAC clerk typist. On October 23, 1987 John Jermak offered Ms. Bender the position. Mr. Jermak informed Ms. Bender of the days and hours the job required, and gave her approximately one hour to decide if she would accept the assignment. Ms. Bender felt she could not accept the assignment due to family commitments, and refused the assignment. Mr. Henson later informed Ms. Bender that she resigned and would not receive the benefits for either a voluntary separation, for which the deadline had expired, or an involuntary layoff.
Plaintiff Sheila Cochran was the third employee assigned the position of RTAC clerk typist. On October 27, 1987 Ms. Cochran refused the assignment because she felt she was overqualified for the position.[6] Mr. Henson informed Ms. Cochran that refusing the assignment was a resignation and she would not receive any separation benefits. The fourth employee who was assigned the RTAC position accepted it and still works in this position for AT & T.[7]
Plaintiffs were all permitted to work until October 30, 1987 and were paid for this time. Of approximately 700 employees affected by the consolidation, only 48 employees were involuntarily laid off. The majority of employees either relocated to Atlanta or voluntarily terminated. Only a few employees, like plaintiffs, were considered to have resigned because they refused a reassignment after the deadline for electing a voluntary separation had passed.
The parties stipulated to the type and amount of severance benefits to which plaintiffs would have been entitled if they were involuntarily laid off rather than considered resigned. The lost benefits are as follows:

 Item Cochran Bender Hegger
Severance Pay $1,131.00 $1,131.00 $1,131.00
Savings Plan Contributions 586.95 1,488.16 1,283.21
Medical Insurance Premiums 0 245.13 0

II. Conclusions of Law
Plaintiffs assert that AT & T's denial of severance benefits violates § 502 of al of severance benefits violates § 502 of the ERISA, 29 U.S.C. § 1132. Title 29
*288 U.S.C. § 1132(a)(1)(B) provides:
A civil action may be brought by a principal or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.
Before Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), a court reviewing the denial of ERISA benefits employed the arbitrary and capricious standard. Johnson v. Enron Corp., 906 F.2d 1234, 1237 (8th Cir.1990). In Firestone, however, the Court held that "a denial of benefits challenged under § 1132(a)(1)(B) of ERISA is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone, supra, 109 S.Ct. at 956. If the benefit plan gives the administrator or fiduciary discretionary authority, then the Court may review the benefit determination under the arbitrary and capricious standard. Lakey v. Remington Arms Co., 874 F.2d 541, 544 (8th Cir.1989).
In the instant matter the administrator did not have discretionary authority to determine eligibility for benefits. As part of the October, 1987 force adjustment AT & T established a program by which employees could elect to transfer to Atlanta or voluntarily separate. If the employee chose to relocate to Atlanta by October 15, 1987 she would receive a transfer. If the employee chose a voluntary separation by October 16, 1987 she would receive separation benefits but no recall rights. If the employee chose neither option, and was involuntarily laid off on October 30, 1987 she would receive separation benefits with recall rights. Under the 1987 force adjustment procedures the payment of separation benefits to an employee was not in the discretion of the administrator but followed automatically from the selection of the employee. Therefore, the Court will review the denial of benefits under the de novo standard of review.[8]
The Court must apply federal common law in the adjudication of claims under the ERISA. Lyman Lumber Co. v. Hill, 877 F.2d 692, 693 (8th Cir.1989). A federal court may look to state law for guidance in fashioning a body of federal common law applicable to ERISA. Id. The theory on which plaintiffs rely is promissory estoppel. There is considerable authority which holds that claims of promissory estoppel are not cognizable in ERISA suits seeking to enforce rights to employee benefits. See, Degan v. Ford Motor Co., 869 F.2d 889, 895 (5th Cir.1989); Nachwalter v. Christie, 805 F.2d 956, 960-961 (11th Cir.1986); Northwest Administrators, Inc. v. B.V. & B.R., Inc., 813 F.2d 223, 225 (9th Cir.1987). However, in Landro v. Glendenning Motorways, Inc., 625 F.2d 1344, 1355 (8th Cir.1980), the Eighth Circuit explicitly approved the use of promissory estoppel in ERISA cases.[9]See also Black v. *289 TIC Investment Corp., 900 F.2d 112, 114 (7th Cir.1990) (The Court notes the recent trend among courts to allow the use of estoppel in ERISA cases).
Section 90 of the Restatement (Second) of Contracts states:
A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.
From Section 90 courts have derived four essential elements of promissory estoppel: (1) a promise, (2) detrimental reliance on the promise, (3) injustice can only be avoided by enforcement of the promise, and (4) the promisor should have or did in fact clearly foresee the precise action which the promisee took in reliance. A.L. Huber & Son v. Jim Robertson Plumbing, 760 S.W.2d 496, 498 (Mo.App.1988). The first essential element of promissory estoppel is that the defendant has made a binding offer in the form of a promise. Burst v. Adolph Coors Co., 650 F.2d 930, 932 (8th Cir.1981). The promise must be sufficiently definite and delineated to support a claim of detrimental reliance. Bower v. AT & T Technologies, Inc., 852 F.2d 361, 366 (8th Cir.1988).
Plaintiffs assert that AT & T promised them that they would be involuntarily laid off, with benefits, on October 30, 1987. Plaintiffs relied to their detriment on this promise when they forewent choosing either relocation to Atlanta or voluntary separation by their respective deadlines. Defendants assert, that no such promise can be construed from its written and oral communications to plaintiffs. The Court, therefore, must determine whether the communications from AT & T to plaintiffs impliedly constituted a promise to plaintiffs that they would be involuntarily laid off if they forewent the election of relocation or voluntary separation.
In March, 1987 AT & T informed its employees at the Ballwin facility that work was being consolidated in Atlanta and that there would be a number of layoffs. On October 2, 1987 plaintiffs received notice that they were "scheduled to be laid off" on October 30, 1987.
The notice stated:
I regretfully inform you that you are scheduled to be laid off. Your last day of employment will be October 30, 1987.
In AT & T's "Guidelines for Termination Due to Force Adjustment  Non-Management" ("Guidelines"), AT & T stated: "Employees taking a voluntary separation or involuntary layoff shall be granted a termination allowance...." Plaintiffs argued that the October 2, 1987 notice and structure of the sentence in the Guidelines led them to believe that involuntary layoff was a choice of the employee, which plaintiffs subsequently selected, rather than an action of the employer. The October 2, 1987 notice, however, states that plaintiffs were scheduled to be laid off, not that they definitely would be laid off. Although the Guidelines might lead plaintiffs to the oxymoronic conclusion that they could choose involuntary layoff, subsequent communications from AT & T reveal that employees scheduled to be laid off on October 30, 1987 would only suffer this fate if they did not elect to relocate to Atlanta, elect to voluntarily terminate, or receive a reassignment during October, 1987.
At the October 5 meeting, Mr. Henson encouraged plaintiffs to rely on the October 2, 1987 letter announcing their scheduled layoff when electing whether to relocate to Atlanta or voluntarily terminate. Mr. Henson, however, discussed the slight chance of reassignment for those who elected neither option. Mr. Henson stated that some positions would become available if previously reassigned employees elected to take a voluntary termination, but that no employee scheduled to be laid off should count on getting reassigned to one of these positions. Mr. Henson did not want employees to forego their options of relocation or voluntary termination in the hope of being reassigned. Mr. Henson assumed that a reassignment would be viewed positively by the employee receiving it.
Plaintiffs admitted they were aware that they might be reassigned if they did not *290 elect a transfer or a voluntary separation by the respective deadlines. Although Mr. Henson stressed the improbability of a reassignment, he still discussed the possibility at some length. Therefore, plaintiffs unreasonably inferred that they would definitely, rather than probably, be involuntarily laid off if they did not elect relocation or voluntary separation.
Plaintiffs were considered resigned after they refused a reassignment to a position they considered undesirable. Plaintiffs inferred that they would only have to accept a reassignment if it was to a comparable position. This inference was clearly unjustified. First, AT & T never stated in any communication that reassignments would be to comparable positions. Furthermore, plaintiffs should have been aware that a reassignment was likely to be to a less desirable position. All three plaintiffs worked for AT & T at its Ballwin facility during the first two force adjustments. Two of the plaintiffs had been demoted during those force adjustments. Plaintiffs were aware that AT & T employed persons to work shifts in the evening and on weekends. Therefore, plaintiffs should have known there was a possibility that an opening, and a reassignment, might be to a shift with evening or weekend hours.
No communication from AT & T addresses the consequences of refusing a reassignment after the deadline for choosing voluntary separation has expired. Plaintiffs, therefore, were never informed of the consequences if they refused a reassignment. In an action based on promissory estoppel, plaintiffs must prove a promise. Plaintiffs, however, have only an assumption, not a promise. AT & T never promised plaintiffs that they would be able to refuse a reassignment and retain their right to separation benefits. If so, few employees would have elected voluntary separation, without recall rights, by the October 16, 1987 deadline. Instead, the employees would have opted to wait for a possible reassignment, accepted the reassignment if it suited them, and refused the reassignment and collected separation benefits if it did not suit them. The reassignment to an undesirable position was an implied risk of not electing the voluntary separation by the October 16, 1987 deadline. Although the risk of refusing an undesirable reassignment was never expressed, the risk was obviously considered by the numerous employees who elected a voluntary separation by the given deadline.
AT & T established an October 16, 1987 deadline for an employee to elect a voluntary separation with benefits. Employees who were reassigned to positions before the deadline were able to voluntarily separate with benefits. The employees receiving reassignments before the October 16, 1987 deadline tended to be the higher paid, non-entry level employees. Plaintiffs, however, were reassigned after the deadline for electing a voluntary separation. Therefore, plaintiffs were not able to convert their reassignment to a voluntary separation with benefits. The rigidity of the October 16 deadline for electing voluntary separation may be viewed as unfair by plaintiffs. The use of the deadline, however, does not violate the ERISA because it did not subject plaintiffs to treatment different than other employees in a similar situation. There is no evidence that any other employees who were reassigned after the October 16, 1987 deadline were able to convert their reassignment to a voluntary separation with benefits.
"[T]he doctrine of promissory estoppel is not concerned with the good faith or bad faith of the promisor in making the promise allegedly relied on." Burst v. Adolph Coors Co., 503 F.Supp. 19, 22 (E.D.Mo. 1980), aff'd 650 F.2d 930, 932 (8th Cir.1981). Although the good or bad faith of the promisor is not a consideration of the Court, the Court finds that AT & T did not offer plaintiffs the RTAC clerk typist position in order to deprive them of separation benefits. Instead, plaintiffs were selected for the reassignment because they had better work appraisals and greater seniority than the other employees scheduled for layoff. Although the position necessitated working evenings and weekends, the position involved a comparable level of responsibility and a substantial increase in pay. *291 Ms. Pennycuick even encouraged Ms. Cochran to take the position as a good opportunity rather than refuse it and lose her benefits.
AT & T made no promise to plaintiffs that they would be involuntarily laid off. Instead, a conditional promise was made that if plaintiffs were not reassigned to another position, they would be involuntarily laid off and receive separation benefits. Therefore, the lack of a reassignment was a condition of the promise of an involuntary layoff with benefits. Because the condition of the promise was not met, plaintiffs could not have reasonably relied on the promise.
Accordingly, the Court enters judgment in favor of defendants and against plaintiffs on the merits of plaintiffs' first amended complaint.
NOTES
[1] AT & T Technologies, Inc. was merged into American Telephone and Telegraph Co. on January 1, 1990. The Court refers to American Telephone and Telegraph Co. and AT & T Technologies, Inc. collectively as "AT & T".
[2] AT & T also called the November, 1984 and August, 1986 layoffs "force adjustments."
[3] During the layoffs in November, 1984 and August, 1986 AT & T developed what it called "normal force adjustment procedures." The goal of "normal force adjustment procedures" was to minimize the number of involuntary lay offs. The precise substance of "normal force adjustment procedures" is a mystery. No organization or compilation of these procedures was presented to the Court.
[4] The Court constructed this passage from its notes. The remaining passages were provided by defendant from a transcript of the meeting that was not filed with the Court.
[5] The RTAC clerk positions were formerly filled by employees of a temporary employment agency.
[6] Ms. Cochran told Sue Pennycuick, personnel services manager, that she was dissatisfied with the assignment. Ms. Pennycuick considered the assignment a good opportunity and encouraged Ms. Cochran to accept it.
[7] There was testimony that three other persons: Pat Turner, Donna Spencer, and Ara Stevens were offered the RTAC clerk typist position and refused it. There was no testimony concerning the subsequent employment status of these three employees.
[8] AT & T draws the Court's attention to the "AT & T Savings Plan for Salaried Employees  Summary Plan Description" ("AT & T Savings Plan"), which provides:

The Savings Plan Committee has the responsibility of administering the Plan including the right to grant or deny initial claims for benefits under the Plan. * * * * The Savings Plan Committee determines conclusively for all parties all questions arising in the administration of the Plan and any decision of this Committee is not subject to further review.
AT & T Savings Plan, at 17. Also, AT & T's Medical Expense Plan provides:
[T]he insurance carrier has the exclusive right to interpret the provisions of the Plan, so its decision is conclusive and binding.
AT & T Medical Expense Plan, at 24. In Baxter v. Lynn, 886 F.2d 182, 188 (8th Cir.1989), the Court interpreted similar language in a benefit plan to still require de novo review.
[9] In Landro the court held that § 514(b)(1) of ERISA compelled the application of Minnesota law rather than federal common law. However, the Court in Landro stated:

In any event, we find the law of Minnesota to be in accord with the general principles of the law of contracts as applied to private welfare and pension plans to which we would look as a source for federal law on the questions involved in this case.
625 F.2d at 1352. Therefore, the Court may utilize Restatement (Second) of Contracts § 90, quoted with approval in Landro, as a source for federal common law.