Charles E. ELLISON

v.

SHENANGO INCORPORATED PEN-
SION BOARD, Andrew Aloe, individu-
ally and in his capacity as administra-
tor of the Shenango Inc. Pension Plan,
and Shenango Inc.

v.

William P. SNYDER, IV, Third Party,

v.

Jonathan S. SPATZ, Fourth Party,

Andrew Aloe, in his capacity as Adminis-
trator of the Shenango Incorporated
Pension Plan (the "Administrator"),
and the Shenango Incorporated Pen-
sion Plan (the "Plan"), Appellants at
No. 91-3094.

Charles E. ELLISON, Appellant,

v.

SHENANGO INCORPORATED PEN-
SION BOARD, Andrew Aloe, individu-
ally and in his capacity as administra-
tor of the Shenango Inc. Pension Plan
and Shenango Inc.

v.

William P. SNYDER, IV

v.

Jonathan S. SPATZ.

Nos. 91-3094, 91-3112.

United States Court of Appeals,
Third Circuit.

Argued Sept. 20, 1991.

Decided Feb. 18, 1992.

Timothy P. O'Brien (argued), Sikov & Love, P.A., Pittsburgh, Pa., for Charles E. Ellison.

Michael D. Glass (argued), Anthony J. Polito, Polito & Smock, P.C., Pittsburgh, Pa., for Shenango Inc. Pension Bd., Andrew Aloe, individually and in his capacity as Administrator of the Shenango Inc. Pension Plan, and Shenango Inc.

Anthony J. Basinski (argued), Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for William P. Snyder, IV.

Before BECKER and HUTCHINSON, Circuit Judges, and FULLAM, District Judge.*

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

### I.

In these consolidated appeals, at Docket No. 91–3112, Charles E. Ellison (Ellison) appeals an order of the United States District Court for the Western District of Pennsylvania denying his request for an award of attorney's fees against the Shenango Inc. Pension Plan and Andrew Aloe, in his capacity as the Plan Administrator (collectively "the Plan"). Ellison sought fees after successfully recovering pension benefits from the Plan under the Employee Retirement Income and Security Act (ERISA), 29 U.S.C.A. §§ 1001–1461 (West 1985 & Supp.1991). At Docket No. 91–3094, the Plan appeals the district court's award of benefits to Ellison and its entry of judgment against it and in favor of third party defendant William P. Snyder, IV (Snyder). We will affirm the award of benefits to Ellison and the district court's entry of judgment in favor of Snyder. We have concluded that the district court erred, however, in its application of the test that we set forth for awarding attorney's fees in ERISA cases in *Ursic v. Bethlehem Mines*, 719 F.2d 670, 673 (3d Cir.1983). We will therefore vacate the district court's order denying Ellison's request for attorney's fees and remand to the district court for further proceedings in accordance with this opinion.

### II.

On August 17, 1987, Ellison commenced this action in the United States District Court for the Western District of Pennsylvania against defendants Shenango Inc., the Shenango Inc. Pension Board and Andrew Aloe, individually and in his capacity as Administrator of the Shenango Inc. Pension Plan. Ellison sought to recover pension benefits under ERISA. The Plan defendants joined Snyder, former President of Shenango Inc., as a third party defendant. Snyder in turn joined Jonathan Spatz (Spatz), Vice–President and Chief Executive Officer of Shenango Inc., as a fourth party defendant.

The action proceeded to a bench trial in September 1990. On January 9, 1991 the district court filed Findings of Fact and Conclusions of Law and entered judgment against the Plan, directing it to restore to Ellison 70/80 pension benefits it had revoked,[1] and in favor of Shenango Inc. on

---

* Hon. John P. Fullam, Senior District Judge of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

1. A 70/80 pension is calculated based on the combination of an employee's age and years of service. The relevant provision of the pension plan in this case provided for 70/80 pension benefits as follows:

> *70/80 Retirement Date.* A participant who has at least 15 Years of Continuous Service and (i) has attained the age of 55 years and whose combined age and Years of Continuous

the same claim. Judgment was also entered in favor of third party defendant Snyder and against all defendants on their third party complaint and in favor of Spatz and against Snyder on his fourth party complaint. The district court denied Ellison's request for an award of attorney's fees against the Plan.

The district court denied all motions for post-trial relief in a Memorandum Order dated January 29, 1991. The Plan filed a timely Notice of Appeal concerning the entry of judgment in favor of Ellison and in favor of Snyder. Ellison filed a timely cross-appeal concerning the district court's denial of his request for attorney's fees, and its entry of judgment against him and in favor of Shenango Inc.[2]

### III.

Ellison began his employment with Shenango Furnace Company (Shenango Furnace), the parent company of Shenango Inc., in 1951. He worked as a laborer there until drafted into the military. At the end of his military duty, he attended college and worked at Shenango Furnace during the summer months. After this break in service, Ellison was continuously employed by either Shenango Furnace or Shenango Inc. from 1959 until March 31, 1986.[3] Ellison held various positions during his tenure at Shenango Inc. in the accounting and data processing departments and became the office manager of Shenango Inc. in September 1979. He was later appointed corporate secretary of both Shenango Inc. and Shenango Furnace. Both corporations shared the same office building and Ellison also supervised employees of Shenango Furnace but received no compensation for this work or for acting as Shenango Furnace's corporate secretary.

Shenango Furnace and Shenango Inc. were closely-held corporations owned by the Snyder family. William P. Snyder, III was President and Chairman of Shenango Furnace and his son, William P. Snyder, IV, was President of Shenango Inc. In 1985, the Boggs Corporation, a corporation controlled by the Aloe family, after negotiations with the Snyder family, agreed to acquire Shenango Inc. in a stock purchase transaction. The Stock Purchase Agreement was executed on February 20, 1986 by Mark Aloe, President of the Boggs Corporation and William P. Snyder, III.

The Stock Purchase Agreement required Shenango Furnace to obtain the resignation of all officers and board members of Shenango Inc. on or before March 24, 1986, the closing date of the sale. Some employees deemed necessary to the continued success of Shenango Inc. were retained. These included Snyder as President, and Frank Leja (Leja) as Director of Employee Benefits. It was decided that Ellison would not be retained and he resigned as secretary of Shenango Inc. on March 20, 1986. Because of the movement of Shenango Inc.'s headquarters, Ellison was also no longer needed as its office manager but he continued his duties as corporate secretary of Shenango Furnace.

Ellison began asking Leja about his pension eligibility in January or February of 1986. Leja advised Ellison to retire under the Shenango Inc. Pension Plan, rather than transfer his benefits to the Shenango Furnace Pension Plan where he intended to continue employment, because of the Shenango Inc. Pension Plan's provision for greater medical benefits. Ellison's final day of employment with Shenango Inc. was on March 31, 1986 and he filed an application for a pension with Leja on April 1,

---

Service shall equal 70 or more, or (ii) whose combined age and years of Continuous Service equal 80 or more, and

. . . . .

(3) who considers that it would be in his interest to retire and his Employer considers that such retirement would likewise be in its interest and it approves an application for retirement under mutually satisfactory conditions

may retire on a 70/80 Retirement Date on the first day of any month.
Appendix (App.) at 592.

**2.** Ellison does not mention his appeal from the entry of judgment in favor of Shenango Inc. in his brief. Therefore, we will not consider it.

**3.** Shenango Inc. was formed sometime in May of 1962 and Ellison was transferred there in June of 1962.

1986. Leja testified that he initially filled out Ellison's application for a pension on the basis of thirty years of continuous service. Leja did so at Snyder's direction although he felt that Ellison might not be entitled to a pension based on thirty years of continuous service, because it entailed crediting him with service prior to his break in service, and no employee had ever received continuous service credit for non-continuous service. Leja told Snyder he would present the pension to the Pension Board for review. On or about the same day, Leja was informed by Daniel Wehner (Wehner), former Vice–President of Shenango Inc. and member of the Shenango Inc. Pension Board, that Snyder had approved a 70/80 mutual interest pension for Ellison. Leja crossed out the "X" next to the thirty-year pension box on the application and placed an "X" next to the 70/80 pension box. Leja testified that he calculated the amount of the 70/80 pension, $1,158 plus a $400 supplement per month, based upon Ellison's 27 years, 2 months and 25 days of continuous service. The pension was inadvertently processed, however, based on a different computation sheet which credited Ellison with thirty years of continuous service and made the pension worth $1,317 plus a $400 supplement per month. The application to award Ellison a 70/80 mutual interest pension based on thirty years of continuous service was approved by the Shenango Inc. Pension Board in April 1986. The Board consisted of Leja, Wehner and Gloria Christenson (Christenson).[4] Ellison was informed of the approval in writing on April 25, 1986 and received a lump sum payment of $12,-691.14 in May 1986.

The Stock Purchase Agreement prohibited any officer of Shenango Inc. from granting a pension worth more than $10,000 to any individual prior to the closing date of March 24, 1986. Mark Aloe also directed Snyder, sometime after the closing, to obtain his approval before making any corporate expenditure in excess of $10,000 or before taking any other significant corporate act. This later directive was not reduced to writing and it did not include any express limitation on Snyder's approval of 70/80 pensions. Snyder never told Mark Aloe about his approval of Ellison's 70/80 pension, but he did discuss the possibility of approving Ellison's pension with Andrew Aloe.

The Plan contends that Snyder approved a 70/80 mutual interest pension in excess of $10,000 while the restrictions in the Stock Purchase Agreement against such approval were in effect. Snyder recalled being approached by Wehner concerning a 70/80 pension for Ellison. Snyder said he thought he had approved Ellison's pension before the closing date. Leja testified that he received a communication from Wehner on or about April 1st, after the closing date, that Snyder had approved a 70/80 pension for Ellison. Andrew Aloe testified to a conversation with Snyder around the time of the closing in which Snyder indicated that he was considering awarding Ellison a 70/80 pension. The district court found that Snyder's approval of Ellison's pension was post-closing and thus not prohibited by the Stock Purchase Agreement.

In June 1986, Shenango Inc. hired Spatz as its Vice–Chairman and Chief Executive Officer. Spatz reviewed pending pension applications with Christenson. He also reviewed Ellison's approved pension and found the application was irregular because the "X" next to the thirty-year pension provision had been crossed out and the application had no written approval for a 70/80 pension by a Shenango Inc. officer. As a result, Spatz directed Christenson to process Ellison's pension as a standard thirty-year pension instead of a 70/80 pension. This eliminated the $400 per month

---

4. Wehner submitted his resignation as an officer of Shenango Inc. on March 20, 1986 and left Shenango Inc. on April 1, 1986, after also receiving a 70/80 mutual interest pension approved by Snyder. Nothing in the Stock Purchase Agreement required Wehner to resign as a member of the Pension Board. The district court thus found the Pension Board that initially approved Ellison's pension was properly constituted. Wehner has continued his employment at Shenango Furnace. Leja left Shenango Inc. on or about May 5, 1986.

paid to Ellison under his 70/80 pension.[5] Ellison contacted Spatz when he did not receive the $400 monthly supplement and Spatz told him to reapply for the supplement with the Pension Board. Ellison did so on November 7, 1986. On December 10, 1986, Ellison was notified by Andrew Aloe, the new Plan Administrator, that his 70/80 mutual interest pension plan was revoked because Ellison resigned before filing his pension application and because no corporate officer was authorized to approve his pension on April 1, 1986.[6]

In September 1986 Ellison appealed Andrew Aloe's decision to the reconstituted Pension Board. The reconstituted Pension Board not only affirmed Andrew Aloe's denial of Ellison's 70/80 pension but also revoked his standard thirty-year pension because Ellison's years of service before his break in service were improperly included in the years of continuous service the old Pension Board had credited to him. The new Pension Board then approved a less-lucrative, deferred vested pension based upon 27 years, 2 months and 25 days of service for Ellison.

## IV.

The district court had subject matter jurisdiction over this case under 28 U.S.C.A. § 1331 (West Supp.1991). This Court has appellate jurisdiction over both the final order of the district court on the merits and its order denying Ellison's request for attorney's fees under 28 U.S.C.A. § 1291 (West Supp.1991).

## V.

We will affirm the district court's entry of judgment in favor of Ellison and against the Plan and in favor of Snyder because we have concluded that the issues raised in the appeal of the Plan at Docket No. 91–3094 from the award of benefits to Ellison lack merit. On the merits of that appeal, the district court stated that it "[did] not have the authority to sit in review of the propriety of William P. Snyder, IV's non-fiduciary decision to approve the mutual interest pension." Findings of Fact and Conclusions of Law, at 14 [hereinafter "Findings"] (citing *Berger v. Edgewater Steel Corp.*, 911 F.2d 911, 918 (3d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1310, 113 L.Ed.2d 244 (1991); *Hlinka v. Bethlehem Steel Corp.*, 863 F.2d 279, 286 (3d Cir. 1988)). The Plan first contends the district court erred in determining Ellison was entitled to a 70/80 mutual interest pension because the requisite "mutuality of interest" was absent.

In *Berger,* we held that an employer is entitled to almost "unbounded discretion" in determining whether an employee's retirement is in the company's best interest, and that the employer's decision is not a fiduciary decision under ERISA. *Berger,* 911 F.2d at 919; *see also Hlinka,* 863 F.2d at 286. *Berger* and *Hlinka* deal with the non-fiduciary obligation an employer owes employees when it exercises business discretion in awarding or denying 70/80 pension benefits. Under those cases, the employer owes at best a minimal obligation of good faith to the employee in deciding whether to award or deny a 70/80 pension. *See Berger,* 911 F.2d at 919. This case does not concern Shenango Inc.'s breach of any obligation to its employee, Ellison, but rather whether Snyder, as the agent of Shenango Inc., violated his duty of loyalty to his principal in approving Ellison's 70/80 pension. *Berger* and *Hlinka* do not dispose of the question whether Snyder's action was binding on Shenango Inc. under the law of agency, a question to which we now turn.

With respect to the district court's entry of judgment in favor of Snyder and against it, the Plan contends that the district court's finding that the Stock Purchase Agreement did not prohibit Snyder's ap-

---

**5.** At the time Ellison's pension was approved, the Plan itself did not require written approval of 70/80 pension applications of salaried employees like Ellison. Spatz later introduced procedures requiring such written approval.

**6.** Andrew Aloe later admitted that Section 7.01 of the Shenango Pension Plan authorizes the filing of an application for benefits "at any time prior or subsequent to ... retirement." App. at 507.

proval of Ellison's 70/80 pension was clearly erroneous. Under Federal Rule of Civil Procedure 52, we cannot reverse this finding of the district court unless it is clearly erroneous. We must be "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). We are unable to say that the district court's finding as to Snyder's authority was clearly erroneous.

Alternately, the Plan contends Mark Aloe's oral directive on behalf of the new owners of Shenango Inc. expressly prohibited Snyder from awarding Ellison's pension. On this issue the district court concluded

> while Snyder's approval of Ellison's mutual interest pension was contrary to the intent of the restrictions imposed on his actions by Mark and Andrew Aloe, there was no express direction to Snyder that he not approve mutual interest pensions. Snyder had actual authority as president of Shenango, Inc. to approve the mutual interest pension.

Findings at 12. The district court's finding that Snyder was not restricted in his authority to approve Ellison's pension by the oral instructions of Mark Aloe was not clearly erroneous. Accordingly, the district court's order entering judgment in favor of Snyder and against the Plan will be affirmed. Because Snyder's actions are binding on Shenango Inc., Ellison is entitled to a 70/80 mutual interest pension. Thus, the district court's order entering judgment in favor of Ellison and against the Plan will also be affirmed.

## VI.

■ The district court's order denying Ellison's motion for attorney's fees requires more extended discussion. Section 502(g)(1) of ERISA provides:

> In any action under this subchapter ... by a participant, beneficiary, or fiduciary, the court in its discretion *may* allow a reasonable attorney's fee and costs of action to either party.

29 U.S.C.A. § 1132(g)(1) (West 1985 & Supp.1991) (emphasis added). The district court decided "that it would be inequitable in the extreme to award attorney's fees" in the present action. Findings at 15. Under section 502(g)(1) we review a district court's award or denial of attorney's fees for abuse of discretion. Our review of the legal standards a district court applies in the exercise of its discretion is, however, plenary. *Student Pub. Interest Research Group v. AT & T Bell Lab.*, 842 F.2d 1436, 1442 n. 3 (3d Cir.1988). In short, the district court must apply the " 'correct criteria' " to the facts of the case. *See Ursic*, 719 F.2d at 675 (quotation omitted).

■ This Court first addressed an award of attorney's fees under section 502(g)(1) in *Ursic*. We evaluated the district court's decision to award attorney's fees in light of five factors:

(1) the offending parties' culpability or bad faith;

(2) the ability of the offending parties to satisfy an award of attorneys' fees;

(3) the deterent [sic] effect of an award of attorneys' fees against the offending parties;

(4) the benefit conferred on members of the pension plan as a whole; and

(5) the relative merits of the parties' position.

*Id.* at 673 (citations omitted). This Court has consistently used the *Ursic* factors to evaluate whether a district court has abused its discretion in awarding attorney's fees under ERISA. *See Bell v. United Princeton Properties, Inc.*, 884 F.2d 713, 724–25 (3d Cir.1989) (discussing but not applying *Ursic* factors); *Monkelis v. Mobay Chemical*, 827 F.2d 935, 936 (3d Cir. 1987); *Groves v. Modified Retirement Plan*, 803 F.2d 109, 119–20 (3d Cir.1986); *see also Pierce v. American Waterworks Co.*, 683 F.Supp. 996, 1002 (W.D.Pa.1988); *Vintilla v. United States Steel Corp. Plan*, 642 F.Supp. 295, 296 (W.D.Pa.1986), *aff'd mem.*, 815 F.2d 697 (3d Cir.1987); *Home for Crippled Children v. Prudential Ins. Co.*, 590 F.Supp. 1490, 1508 (W.D.Pa.1984).

Ellison urges us to retreat from the *Ursic* factors test and adopt the rule that a prevailing ERISA plaintiff is ordinarily entitled to an award of fees absent "special circumstances" rendering such an award unjust. The special circumstances rule has been adopted in the Fourth, Eighth and Ninth circuits. *See Reinking v. Philadelphia Am. Life Ins. Co.*, 910 F.2d 1210, 1218 (4th Cir.1990); *Smith v. CMTA–IAM Pension Trust*, 746 F.2d 587, 589 (9th Cir. 1984); *Landro v. Glendenning Motorways, Inc.*, 625 F.2d 1344, 1356 (8th Cir. 1980). It has been rejected in the Fifth Circuit. *See Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255 (5th Cir.1980). Other circuits have adopted various middle-of-the-road approaches. *See Bittner v. Sadoff & Rudoy Indus.*, 728 F.2d 820, 830 (7th Cir.1984) (even where five factor test met, special circumstances may make award unjust); *Chambless v. Masters, Mates & Pilots Pension Plan*, 815 F.2d 869, 872 (2d Cir.1987) (applying five factors in light of ERISA's statutory purpose of vindicating retirement rights);[7] *Nachwalter v. Christie*, 805 F.2d 956, 962 (11th Cir.1986) (in applying five factors, courts should bear in mind ERISA's "essential remedial purpose").

Ellison contends that adoption of the special circumstances rule in ERISA cases is justified by analogy to fee provisions in similar remedial legislation. He points to the attorney's fees provisions in the Civil Rights statutes. They contain discretionary language almost identical to that in § 502(g)(1) of ERISA. *See, e.g.*, 42 U.S.C.A. § 2000e–5(k) (West 1981) ("the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee" in Title VII employment discrimination action); 42 U.S.C.A. § 2000a–3(b) (West 1981) ("the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee" in Title II action for discrimination or segregation in places of public accommodation); 42 U.S.C.A. § 1988 (West 1981) ("the court, in its discretion, may allow the prevailing party ... a rea-sonable attorney's fee" in any action to enforce a provision of sections 1981 through 1986 of Title 42); *see also Landro*, 625 F.2d at 1356 (drawing analogy between ERISA and other remedial legislation in adopting rule of liberal construction for attorney's fees under ERISA). The Supreme Court has stated that fees should be awarded to prevailing parties under the Civil Rights statutes absent "special circumstances." *See, e.g., Albemarle Paper Co. v. Moody*, 422 U.S. 405, 415, 95 S.Ct. 2362, 2370, 45 L.Ed.2d 280 (1975) (Title VII); *Newman v. Piggie Park Enters.*, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968) (Title II). Ellison says that an additional policy factor weighs in favor of applying the special circumstances rule in ERISA cases. He draws our attention to the fact that prevailing plaintiffs under ERISA are limited to recovery of pension benefits owed them. *See Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147–48, 105 S.Ct. 3085, 3092–93, 87 L.Ed.2d 96 (1985) (ERISA does not authorize recovery of extra-contractual damages). Thus, says Ellison, without a fee award, the prevailing plaintiff will not be made whole because fees will be come out of benefits he is entitled to under ERISA.

We reject Ellison's request to adopt the special circumstances rule. Not only is *Ursic* a precedent that binds the panel but we also believe the five factors it directs us to consider adequately address ERISA's policy concerns of remediation and deterrence. In *Bowen*, 624 F.2d at 1265, the United States Court of Appeals for the Fifth Circuit declined to adopt the special circumstances rule, in part because of its conclusion that ERISA plaintiffs do not regularly function as "private attorneys general" in the same sense as civil rights plaintiffs do. It noted that in *Northcross v. Board of Educ.*, 412 U.S. 427, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973), the Supreme Court construed section 718 of the Emergency School Aid Act of 1972, 20 U.S.C.A. § 1617, since repealed, to require an award

---

7. Contrary to the concurrence, we do not read *Chambless* as adopting the special circum- stances rule.

of attorney's fees to the prevailing party absent special circumstances. *Bowen*, 624 F.2d at 1265. The Supreme Court in *Northcross* analogized 20 U.S.C.A. § 1617 to the fees provision in Title II of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000a–3(b):

"[T]he two provisions share a common *raison d'etre.* The plaintiffs in school cases are 'private attorneys general' vindicating national policy in the same sense as are plaintiffs in Title II actions. The enactment of both provisions was for the same purpose—to encourage individuals injured by racial discrimination to seek judicial relief...."

*Id.* (quoting *Northcross*, 412 U.S. at 428, 93 S.Ct. at 2202. (internal quotations and citations omitted)).

The *Bowen* court concluded that there are "manifest distinctions" between those civil rights statutes under which the Supreme Court has mandated the award of fees absent special circumstances and section 502(g) of ERISA:

The policies underlying ERISA ... do not rise to the level of assuring that all citizens are accorded their civil rights.... Plaintiffs suing under the [civil rights] statutes are "private attorneys general" in the sense that they seek injunctive relief to vindicate important public rights. If such "plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a position to advance the public interest by invoking the injunctive powers of the federal courts." Plaintiffs under Title I of ERISA may be seeking ... simply the recovery of benefits from the plan that are due them alone.... Thus, incentives in the form of attorneys' fees

are, on the whole, less necessary to insure that the statute is enforced.

... [W]e fail to find in ERISA the compelling circumstances that have led the Supreme Court to construe discretionary attorneys' fees provisions as virtually mandatory.

*Bowen*, 624 F.2d at 1265 (citation and footnotes omitted). We agree with the rationale of the *Bowen* court. Indeed, we cited *Bowen* in our own formulation of the *Ursic* factors. *See Ursic*, 719 F.2d at 673. We do not think a presumption in favor of granting attorney's fees to prevailing plaintiffs is required or appropriate under § 502(g).[8]

Accordingly, we turn to the district court's application of the *Ursic* factors in this case. In deciding a motion for attorney's fees, the district court must set forth the reasoning underlying its decision and, by that reasoning, demonstrate that it has considered appropriate standards in exercising the discretion section 502(g)(1) gives it. *Ursic*, 719 F.2d at 675. Among its factors, *Ursic* calls for consideration of the "culpability or bad faith" and "ability to pay" of the "offending" party. *Id.* Here, instead of considering only the Plan's good or bad faith in denying benefits and its ability to pay, the district court focused on Ellison's alleged bad faith and his ability to pay his legal fees.

With respect to bad faith, the district court made the following conclusion of law:

Although the 70/80 mutual interest pension based on 27 years, 2 months and 25 days service is valid, the plaintiff's obtaining of it was due solely to his and Daniel Wehner's exploitation of their positions, as well as his personal friendship

---

**8.** We find further support for rejection of the special circumstances rule in the language of the ERISA statute. 29 U.S.C.A. § 1132(g)(1) provides:

(1) In any action under this subchapter (other than an action described in paragraph (2)) ... the court, *in its discretion may* allow a reasonable attorney's fee
....

29 U.S.C.A. § 1132(g)(1) (emphasis added). In contrast, 29 U.S.C.A. § 1132(g)(2) provides that in a plan contribution action brought by a fiduciary under 29 U.S.C.A. § 1145 "in which a

judgment in favor of the plan is awarded, the court *shall award* the plan ... reasonable attorney's fees and costs of the action to be paid by the defendant." 29 U.S.C.A. § 1132(g)(2)(D) (emphasis added). Thus, Congress provided for a mandatory award of attorney's fees in specific actions under the ERISA statute but left fee awards in all other actions to judicial discretion. The civil rights statutes do not contain such a distinction. In any event, we are bound to follow *Ursic* which we are unable to read consistently with the special circumstances rule.

with William Snyder, to garner a lucrative employee benefit at the expense of a company at which Ellison had no prospect of future employment and to which he imparted no benefit.

With respect to the first factor—the offending parties' culpability or bad faith—we find that the Shenango Inc. Pension Board and additional defendant Spatz acted in good faith throughout their dealings with plaintiff Ellison's pension. Plaintiff Ellison, although we have found him entitled to a 70/80 mutual interest pension, did not act in good faith in attempting to secure either the 70/80 pension or credit for additional years of continuous service.

Findings at 15–16 (citation omitted).

■ We recognize that the district court properly applied the bad faith factor to the Plan and concluded that it acted in good faith and have no reason to disturb its conclusion in that respect. The district court erred, however, in applying the bad faith factor directly to Ellison, the prevailing party. To the extent that it was proper for the district court to consider Ellison's actions in order to determine whether the Plan's response to them was made in good faith, we believe its finding that Ellison acted in bad faith is clearly erroneous. *See Ford v. Temple Hosp.,* 790 F.2d 342, 347 (3d Cir.1986) (district court's finding of bad faith or absence thereof is factual determination that may only be reversed if clearly erroneous).

There is not sufficient evidence in this record to support the conclusion that Ellison acted in bad faith. Ellison took no part in the decisional process to award him a 70/80 pension beyond submitting and signing his pension application and the district court found that "Ellison was not aware of any restrictions on Snyder's post-closing ... authority to approve his pension." Findings at 13. Several officers of Shenango Inc. themselves testified that there was no wrongdoing on Ellison's part. Andrew Aloe said that beyond Ellison's filing of his pension application, there was no evidence to "indicate intentional deceitfulness" or an "intentional act to mislead" on Ellison's

part. App. at 394. Spatz, who originally suspended Ellison's pension benefits, testified that he "d[id] not know" of any improper action on Ellison's part. App. at 402. Frank Leja, who approved and filled out Ellison's pension form, testified that Ellison did not request to be credited with years prior to his break in service as years of continuous service. Finally, Snyder testified that he had no discussions with Ellison regarding Ellison's 70/80 pension and made the decision to approve the pension on his own. Finally, the district court itself correctly determined that Ellison was entitled to a 70/80 pension.

The only evidence the lower court pointed to was Ellison's friendship with Snyder and Snyder's attempt to confer a 70/80 pension based on thirty years of continuous service. These facts alone, when compared with those cases finding sufficient evidence of bad faith to award fees against the non-prevailing party, cannot support the district court's finding that Ellison acted in bad faith. *See Monkelis,* 827 F.2d at 936 (finding of bad faith because non-prevailing party's claim time-barred and frivolous); *Pierce,* 683 F.Supp. at 1002 (non-prevailing defendant's "arbitrary" and "irresponsible" denial of plaintiff's application for disability benefits warranted finding of bad faith); *Vintilla,* 642 F.Supp. at 296–97 (court's finding of bad faith based on non-prevailing plaintiff's institution of lawsuit which was "highly speculative venture"); *see also Ford,* 790 F.2d at 347 (finding of bad faith requires showing "of an intentional advancement of a baseless contention that is made for ulterior purposes, e.g. harassment or delay"). Absent much stronger evidence than this record presents, an ERISA plaintiff who brings a well-founded, successful claim for benefits cannot be found to have sought and obtained in bad faith benefits he is entitled to.

It might be otherwise if Ellison had himself misrepresented his years of continuous service in order to obtain benefits greater than those he was found entitled to. There is, however, no evidence that Ellison was the one who entered the excess years of continuous service on his application or that he suggested that might be done de-

spite the Pension Board's earlier rejection of his request for inclusion of the years he worked for Shenango Furnace before his break in service in his years of continuous service. The record does show that Leja did not believe that Ellison was entitled to credit for thirty years of continuous service, but that he initially acceded when Snyder instructed him to credit Ellison with additional years of continuous service for the years prior to the break in Ellison's service. Leja had intended to submit the issue to the Shenango Inc. Pension Board for review, but apparently failed to do so after Snyder approved a 70/80 pension for Ellison. Leja himself calculated the 70/80 pension based on 27 years 2 months and 25 days of continuous service, but the pension was inadvertently processed on the basis of a different computation sheet which credited Ellison with thirty years of continuous service. When Ellison was informed by letter of the amount of his pension, the letter did not indicate how the amount had been calculated. Ellison has now withdrawn any claim for a pension based upon thirty years of continuous service. Ellison's friendship with Snyder and Snyder's incorrect, but unsolicited, recommendation that Ellison be given pension credit for thirty years of continuous service are insufficient to establish that Ellison acted in bad faith in applying for his pension.

■ The second *Ursic* factor is "the ability of the offending parties to satisfy an award of attorneys' fees." *Ursic*, 719 F.2d at 673. The district court made the following conclusion of law with respect to this factor:

> The second factor ... is evenly balanced. Shenango, Inc. could easily satisfy an award against the Pension Plan, while the plaintiff will receive a substantial lump sum payment from which fees can be paid.

Findings at 16. It was legal error to apply this factor directly to Ellison, the prevailing party. Ellison's ability to pay is irrelevant to the court's inquiry into the propriety of requiring an offending party to pay a prevailing party's attorney's fees and contradicts the statutory purpose of ERISA to protect pension benefits. Ellison's receipt of a lump sum payment was the result of Shenango Inc.'s unlawful withholding and consequent delay in paying Ellison the pension benefits he was entitled to. It is incorrect to consider the lump sum Ellison belatedly received as a result of successful litigation as a source of funds out of which he can pay his attorney's fees. Accordingly, we hold the district court should not have considered the lump sum payment to Ellison in determining the propriety of an award of attorney's fees in this case.

The district court also erred in deciding the financial resources available to the parties to pay fees were "evenly balanced." Findings at 16. Since Shenango does not dispute the sufficiency of the Plan's assets to cover an award of fees in this case, the district court should have resolved the second *Ursic* factor in favor of an award of fees to Ellison. *See Kann v. Keystone Resources, Inc.*, 575 F.Supp. 1084, 1096 (W.D.Pa.1983) (fee award based in part on showing that non-prevailing defendant pension plan in "comfortable financial position"). A finding in Ellison's favor on this factor may have changed the district court's decision.

We find no error in the district court's conclusion that the third and fourth *Ursic* factors, deterrence of similar conduct and benefit to other members of the pension plan, "urge against the award of fees." Findings at 16. Likewise, we cannot fault its conclusion that the fifth factor, the relative merits of the parties' positions, weighed in Ellison's favor. In summary, we hold that the district court correctly applied the following *Ursic* factors: the Plan's good faith, the lack of a need to deter the Plan and Andrew Aloe from similar conduct and the lack of benefit to other Plan members from Ellison's pursuit of benefits. On the other hand, we hold that the district court incorrectly considered Ellison's good or bad faith in applying for pension benefits and his ability to pay attorney's fees from the delayed lump sum payment he would receive as a result of his successful litigation.

Because the district court, in denying Ellison's request for attorney's fees, improperly considered Ellison's bad faith and failed to construe the ability to pay factor in favor of an award of fees, we will vacate the district court's order denying Ellison's request for fees and remand for reconsideration of the fee issue. On remand, the district court should, consistent with this opinion, reconsider each factor "in balance and relationship to the others." *Vintilla,* 642 F.Supp. at 296. Whether the balance will shift in Ellison's favor, so as to entitle him to attorney's fees, is a question left to the discretion of the district court on remand.

### VII.

The order of the district court entering judgment in favor of Ellison and in favor of third party defendant Snyder and fourth party defendant Spatz and directing the Plan to restore Ellison's revoked pension benefits will be affirmed. The order denying Ellison's request for an award of attorney's fees will be vacated and the case is remanded for reconsideration of that question in a manner consistent with this opinion.

FULLAM, Senior District Judge, concurring.

I agree that the findings of the district judge on the merits—that Snyder had authority to grant the 70–80 pension, and that the pension was granted after the closing—are not clearly erroneous, and that judgment was properly rendered in favor of the plaintiff. I also agree that the denial of attorney's fees should be reversed, but I am unable to agree with several aspects of the majority's discussion of that issue.

The law of this circuit on the award of counsel fees under § 502(g)(1) of ERISA, 29 U.S.C. § 1132(g)(1), is set forth in *Ursic v. Bethlehem Mines,* 719 F.2d 470 (3rd Cir.1983), by which this panel is, of course, bound. As Judge Weis stated, the statute "does not automatically mandate an award to a prevailing party", and it is appropriate to consider the five factors which courts generally have taken into account in considering fee awards. I entirely agree with the majority, therefore, that the district court erred in denying counsel fees because of the purported bad faith of the prevailing party. Assuming, without deciding, that a prevailing party could ever be chargeable with bad faith conduct in any relevant respect, the present record does not provide a basis for charging this plaintiff with bad faith—all he did was apply for a pension which he was entitled to receive.

My disagreement with the majority arises from its suggestion that counsel fee awards under ERISA are less favored, and must withstand stricter scrutiny, than awards pursuant to other Congressional enactments employing identical language. The majority finds support for that view in a Fifth Circuit decision, *Ironworkers Local 272 v. Bowen,* 624 F.2d 1255 (5th Cir.1980), which is, in this respect, at odds with the decisions of every other circuit court of appeals.

The Supreme Court stated, in *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968), that when Congress, in Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a–3(b) provided that "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, an award of attorney's fees to prevailing plaintiffs should follow as a matter of course, unless special circumstances would render such an award unjust", at p. 390 U.S. 400, 402 at p. 88 S.Ct. 964, 966.

And in *Northcross v. Board of Education,* 412 U.S. 427, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973), the Court reached the same conclusion in construing virtually identical language in the Emergency School Aid Act of 1972, 20 U.S.C. § 1617, stating "The similarity of language in § 718 and § 204(b) is, of course, a strong indication that the two statutes should be interpreted *pari passu*".

Congress has again employed virtually identical language in § 502(g) of ERISA, and it is therefore not surprising that most of the courts of appeals which have considered the matter have concluded that Su-

preme Court precedent mandates the conclusion that, under ERISA as well as Title II and the School Aid Act, prevailing plaintiffs should ordinarily be awarded counsel fees as a matter of course, unless special circumstances render such an award unjust. *Smith v. CMTA–IAM Pension Trust,* 746 F.2d at 597, 590; *Reinking v. Philadelphia American Life Ins. Co.,* 910 F.2d 1210, 1218 (4th Cir.1990); *Chambless v. Masters, Mates and Pilots Pension Plan,* 815 F.2d 869 (2d Cir.1987); and *Landro v. Glendenning Motorways, Inc.,* 625 F.2d 1344, 1356 (8th Cir.1980).

In *Iron Workers Local No. 272 v. Bowen, supra,* the Fifth Circuit concluded that, notwithstanding the virtually identical language in all three statutes, and the Supreme Court's identical ruling under two of them, § 502(g) of ERISA should not be accorded the same interpretation. Speaking for the court, Judge Gee noted that the Supreme Court had reasoned that Congress wished to encourage enforcement actions by "private attorneys general" under Title II and the school statute, and that litigation under those statutes frequently involved injunctive and declaratory relief beneficial to others than the named plaintiff, whereas, in his view, many ERISA actions would benefit no one but the parties. Hence, in his view, the presumption of a fee award to prevailing plaintiffs does not apply in ERISA cases. The majority in this case has now accepted the same reasoning, but I respectfully disagree.

The signal that Congress wishes to encourage private enforcement actions by "private attorneys general" is inherent in the authorization to award counsel fees. In all three of the statutes under consideration, Congress has made that intent manifest. Many—indeed, most—private actions under Title II of the Civil Rights Act provide no direct benefit to anyone other than the named plaintiff, but the value of such actions as an enforcement mechanism cannot be overlooked. Congress has not specified that counsel fees may only be awarded in class actions, or where wide-ranging injunctive or declaratory relief is afforded. Although a private action under ERISA to obtain pension benefits improperly denied may provide direct benefit only to the prevailing plaintiff, its value as an enforcement mechanism to ensure future compliance by the offending parties cannot be overlooked.

In my view, it is impossible to justify construing the counsel fee provisions of § 502(g) of ERISA differently from similar provisions in the other statutes discussed above unless there is a valid basis for concluding that the enforcement of ERISA is, as a policy matter, of less importance to the public than is enforcement of other acts of Congress. Some of the language employed in the *Ironworkers Local No. 272 v. Bowen* decision can be read as assuming, or inferring, that ERISA enforcement is less important. I respectfully suggest, however, that it is not the business of judges to make such policy choices.

In short, I adhere to the view of the majority of the circuits, namely, that in ERISA actions, counsel fees should ordinarily be awarded to prevailing plaintiffs as a routine matter, unless there are special circumstances which justify denial of such an award. I believe this conclusion is compelled by Supreme Court precedent. And I note that there is nothing in the *Ursic* decision to the contrary: although Judge Weis did cite the *Ironworkers* case, he construed it as merely supporting the view that attorney's fees are not automatically mandated.

When a statute provides that a court "may" award counsel fees, an exercise of judicial discretion is triggered. Judges are not permitted to act arbitrarily. It seems likely, therefore, that when an award is authorized, it will not be withheld unless there is some valid reason for denial. And it is conceivable that, over time, more justifiable denials of counsel fees may occur in ERISA cases than in civil rights or school-desegregation cases. But I submit that a proper application of the five *Ursic* factors should suffice to identify those cases, and that the same initial presumptions should be applied under all three statutes.