No. 92-326

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

_____

JIM G. HEAD and TAMI J. HEAD, husband and
wife, on their own behalf, and on behalf
of their minor daughter, MELISSA HEAD,
            Plaintiffs and Respondents,

    -vs-

CENTRAL RESERVE LIFE OF NORTH AMERICA
INSURANCE COMPANY, a foreign corporation,
            Defendant and Third-Party Plaintiff
                            and Appellant.

_____

CENTRAL RESERVE LIFE OF NORTH AMERICA
INSURANCE COMPANY, a foreign corporation,
            Third-Party Plaintiff and Appellant,

    -vs-

JAMES R. PAULI,
            Third Party Defendant and Respondent.

_____

APPEAL FROM:    District Court of the Eleventh Judicial District,
                In and for the County of Flathead,
                The Honorable Joe L. Hegel, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

            Daniel  W.  Hileman;  Murray  &  Kaufman,  P.C.,
            Kalispell, Montana

        For Respondent:

            Stephen C. Berg; Warden, Christiansen, Johnson &
            Berg, Kalispell, Montana
            George B. Best, Attorney at Law, Kalispell, Montana

_____

Submitted on Briefs:  October 22, 1992

Decided:  January 12, 1993

_____
                        Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

Defendant Central Reserve Life of North America Insurance Company, appeals the decision by the Eleventh Judicial District, Flathead County, Montana, awarding plaintiffs Jim G. Head and Tami J. Head a judgment in the amount of $172,765.13 plus attorney's fees in the amount of $43,191.28 and costs of $4,165.73, for a total judgment of $220,122.14. We affirm.

The issues presented for our review are:

1. Whether the District Court erred in allowing the case to be tried by a jury.

2. Whether the District Court erred in directing a verdict in favor of third-party defendant Pauli and in denying Central Reserve's motion for a directed verdict.

3. Whether there was sufficient credible evidence to support the jury's verdict.

4. Whether the District Court abused its discretion in awarding attorney's fees and costs to the Heads.

Plaintiffs Jim G. Head and Tami J. Head (Heads) brought this action individually and on behalf of their minor daughter, Melissa Head, against Central Reserve Life of North America Insurance Company (Central Reserve). Central Reserve provided group insurance benefits to employees of Viking Logging (Viking) of Columbia Falls, Montana. Jim Head was employed by Viking.

Viking agreed to provide health insurance coverage for its employees in 1984. The testimony during the trial conflicted as to the date that the employees met with Bruce Reimer (Reimer), the

2

president of Viking, and James R. Pauli (Pauli), an insurance agent, to discuss health insurance benefits and to complete enrollment applications for the group insurance plan. Jim Head testified that he could not remember filling out the application himself, but he did recall answering questions to facilitate the application. Pauli and Ron Kunik, a Central Reserve agent, both testified that they probably would have asked questions of applicants rather than have the employees fill them out themselves. Pauli was not an agent for Central Reserve, but had agreed to act as a go-between between Central Reserve and Reimer because he had handled other insurance matters for Reimer. Pauli was a "captive" insurance agent for Bankers' Life and thus could not sell policies for other insurance providers. Bankers' Life did not provide group plans for loggers at that time. The record establishes that entries on the application form were completed by at least two persons.

Kunik provided information to Pauli about Central Reserve's health insurance coverage and Pauli conveyed this information to Reimer and the Viking employees. The completed insurance applications were dated July 16, 1984, the date that Reimer issued a check for the first premium payment for the policy. The record contains conflicting evidence about the date the applications were completed, which may have been as early as June 22, 1984. Reimer testified that he issued the check on the same date as the only meeting with Pauli. Four witnesses (Jim Head, another Viking employee, Pauli and Kunik) testified that more than one meeting

took place and that applications were filled out prior to July 16, 1984. Various testimony was presented as to who in fact filled out the applications. It is not clear who completed the questions relating to Tami Jo Head and Melissa Head. However, there is evidence that neither Jim Head nor Pauli completed all of the questions on the application.

These factual issues subsequently became critical because on July 11, 1984, Dr. Pitman of Columbia Falls tentatively diagnosed Melissa Head, then 9 months old, as possibly having Von Recklinghausen's disease. He referred Melissa to a Whitefish pediatrician, Dr. Casazza, for a second opinion. Dr. Casazza confirmed Dr. Pitman's diagnosis on July 12, 1984. Von Recklinghausen's disease is more precisely referred to and known as neurofibromatosis.

The testimony at trial established that neurofibromatosis is a condition which manifests itself by brown spots known as cafè-au-lait spots and is not a disease, but rather a predisposition to the formation of tumors on nerve cells, on the coverings of nerve cells, on the spinal cord and on the brain. Neurofibromatosis is not recognized by any medical testing, it has no symptoms and there is no known medical treatment. Medical testimony established that while cafè-au-lait spots are not uncommon in young children, more than six such spots is considered a sign of neurofibromatosis. Neurofibromatosis is diagnosed only by physical examination and requires no medical intervention or treatment prior to the development of tumors or other complications. Dr. Mary Anne

4

Guggenheim, who first saw Melissa in December 1987, analogized the condition to that of having high cholesterol which might predispose an individual to heart attack or stroke.

Except for numerous scattered cafè-au-lait spots indicating neurofibromatosis, Dr. Casazza found Melissa to be normal. He referred Melissa to a Kalispell ophthalmologist, Dr. Steve Weber, to determine whether an optic glioma (tumor) had formed on Melissa's optic nerve; referred the Heads to Shodair Hospital in Helena, Montana, to determine whether future children might also be subject to the condition; and referred Melissa to Shriner's Hospital in Spokane to determine if the condition was affecting her orthopedically.

Dr. Casazza testified that neurofibromatosis is untreatable prior to formation of tumors. After July 12, 1984, Dr. Casazza saw Melissa only for well-baby checks. He testified that he was aware of Melissa's neurofibromatosis during these examinations, although the condition did not change and required no treatment. He advised the Heads to be attentive for additional cafè-au-lait spots and to maintain contact with Dr. Weber and Shriner's Hospital as suggested by them. Dr. Casazza and Dr. Guggenheim each testified that they did not treat Melissa for neurofibromatosis but merely followed her condition.

Dr. Weber continued to examine Melissa periodically to determine whether she developed amblyopia (lazy eye) or optic nerve glioma. Medical testimony established that neurofibromatosis is not classified as a disease or illness. All medical experts

5

discussed neurofibromatosis in terms of a condition as opposed to a disease or illness. All testified that they had not rendered medical treatment for the condition of neurofibromatosis prior to 1987. When asked what he had done for Melissa, Dr. Weber described himself as a "tense observer, watching for the appearance of an optic nerve glioma or other vision-threatening complications" which would make medical treatment necessary.

Medical testimony also established that children with neurofibromatosis are predisposed to optic nerve glioma although tumors can occur at any location in the body where there are nerves. Many people with neurofibromatosis never develop any symptoms more serious than a few lumps and bumps; others with the condition develop serious abnormalities, such as the subject of the movie "Elephant Man." In addition to tumors which can cause bone cysts and skeletal deformity, there may be problems with blood vessels, bone growth and blood flow through the lungs. With the optic nerve, there can be vision problems and loss of sight. Drs. Weber and Casazza monitored Melissa's condition to make sure she did not develop these problems.

Central Reserve established an effective date of August 1, 1984 for health insurance coverage under Viking's plan. Central Reserve handled Melissa's neurofibromatosis as a preexisting condition under the plan. Paragraph 24 of the plan, entitled "General exclusions of the plan," provides:

No benefits will be paid for charges . . .

21. Due to a preexisting illness. Benefits will be paid for charges incurred after the end of a continuous period

> up to twelve (12) months which ends after the effective
> date of coverage and during which no medical care,
> diagnosis, advice or prescribed drugs were received;
> . . .

Central Reserve believed that the visits to Drs. Casazza and Weber constituted "medical care" so as to defeat the running of the twelve-month period for preexisting illnesses. Because Central Reserve originally denied a 1984 claim for Melissa which mentioned neurofibromatosis, the Heads submitted no further claims to Central Reserve relating to neurofibromatosis until late 1987. Central Reserve paid claims for a 1987 CAT scan and an MRI, but later denied them.

In 1987, Melissa began falling, experiencing headaches and a bulge formed on the left side of her head. She was referred to Dr. Guggenheim at Shodair Hospital in Helena. Dr. Guggenheim testified that Melissa had a hole in her skull bone which caused accumulation of fluid outside the brain pushing forward into the area behind her left eye. Dr. Guggenheim testified that although the team of medical specialists initially thought Melissa had a tumor, her problems were the result of a rare abnormality which was not easily diagnosed. Eventually a craniotomy was performed at Children's Hospital in Denver, Colorado, in February 1988. From that time until July 31, 1991, Melissa has had nine surgeries in Denver and one in Detroit, Michigan.

Melissa's first surgery was a massive craniotomy using rib and cranial grafts to try to reconstruct her skull and get it back to a normal position as Melissa had no bone behind her left eye. Since then, other surgeries have been performed to try to stop an

7

erosion of the skull bone and repair holes in Melissa's skull. In December 1990, a shunt was placed in her spine to help drain off fluid and keep pressure down in her brain, which seems to be stopping further bone erosion. In July 1991, the last surgery prior to the trial was performed and more bone was grafted to fill holes in hopes that this will finally solve the problem. All bills for these surgeries were submitted to Central Reserve and all were denied on the ground that the preexisting illness provision of the plan had not been met.

Although Central Reserve had previously denied the December 1984 claim without explanation, it sent a letter to the Heads dated March 28, 1988, denying benefits related to neurofibromatosis because Melissa was not "treatment free" for at least a period of twelve months in accordance with the preexisting illness provision of the plan. Drs. Casazza, Guggenheim and Weber all testified that no treatment had been rendered for the disease until late 1987 when Melissa began to experience symptoms.

Mary Decker, owner of Medical Claims Services in Missoula, testified to an extensive history of processing health claims for different health insurance carriers. She testified that she had reviewed all claims related to neurofibromatosis presented to her by the Heads and, after reviewing the policy, calculated the total owing for unpaid medical expenses, if the neurofibromatosis was covered under the plan, at $172,765.13. Ms. Decker also testified that she is familiar with preexisting condition clauses containing terminology similar to that in Central Reserve's plan. She

determined that there was no twelve-month period during which Melissa was "treatment free" as this phrase is understood in the insurance claims industry because Melissa had not gone without medical care for twelve consecutive months. She based her opinion on Dr. Casazza's referrals to Dr. Weber, Shodair and Shriner's Hospital, which would not have occurred but for the neurofibromatosis.

Ms. Decker testified that the industry interpretation of this language would not find that Dr. Casazza's well-baby examinations constituted the rendering of medical care to Melissa so as to defeat the running of the twelve-month period and that the insurance industry would find that only the two visits to Dr. Weber would defeat the running of the twelve-month period. However, Dr. James Pellagalli, on behalf of Central Reserve, testified that even the visits to Dr. Casazza constituted medical care to defeat the running of the twelve-month period. He further testified that the same would be true if Melissa saw another physician for well-baby checks and that physician also knew of or made an independent diagnosis of neurofibromatosis.

Viking's group health insurance plan is considered an employee welfare benefit and thus, any state claims relating to insurance coverage are preempted by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, et seq. (1988). Over Central Reserve's objection, the case was tried to a jury, commencing on September 23, 1991. After hearing most of the evidence, the District Court granted third-party defendant Pauli's

9

motion for a directed verdict. At the close of the evidence, it denied Central Reserve's motion for a directed verdict. The jury returned a verdict in the Heads' favor against defendant Central Reserve. The District Court subsequently granted the Heads' post-trial motion for attorney's fees.

## I.

Did the District Court err in allowing the case to be tried by a jury?

Central Reserve would have this Court reverse the jury verdict and remand the case for a non-jury trial, which it maintains is in accordance with ERISA. ERISA is silent with respect to jury trials. Nonetheless, Central Reserve contends that the federal circuit courts have consistently held that there is no right to a jury trial in actions governed by ERISA. Central Reserve supports this argument by citing cases which have alleged a wrongful denial of pension benefits. See, e.g., Pane v. RCA Corp., (3rd Cir. 1989), 868 F.2d 631; Nevill v. Shell Oil Co., (9th Cir. 1987), 835 F.2d 209; In re Vorpahl (8th Cir. 1982), 695 F.2d 318; and Wardle v. Central States, Southeast and Southwest Areas Pension Fund (7th Cir. 1980), 627 F.2d 820, cert. denied, 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981).

Prior to the 1975 enactment of ERISA, pension cases were traditionally decided by trust law, which was considered to be equitable in nature. ERISA provides for civil actions to recover benefits as follows:

**(a) Persons empowered to bring a civil action**
A civil action may be brought--

10

> (1) by a participant or beneficiary--
>     (A) for the relief provided for in
> subsection (c) of this section, or
>     (B) to recover benefits due to him under
> the terms of his plan, to enforce his rights
> under the terms of the plan, or to clarify his
> rights to future benefits under the terms of
> the plan;

29 U.S.C. § 1132(a)(1) (1988).

The United States Supreme Court has not addressed the issue of a jury trial under ERISA and not all federal circuits have analyzed the jury trial issue in the same manner as Pane, which held broadly that a § 1132(a)(1)(B) cause of action for recovery of benefits is equitable in nature. Pane, 868 F.2d at 636. Although the Supreme Court has not ruled directly on this issue, it has looked to the common law in place at the time ERISA was enacted to determine the standard of review applicable for a denial of benefits. See Firestone Tire and Rubber Co. v. Bruch (1989), 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80.

The legislative history of ERISA makes clear that the Act should be construed consistent with the Labor-Management Relations Act of 1947 (LMRA). Fuller v. INA Life Ins. Co. of N.Y. (Sup. 1988) 533 N.Y.S.2d 215, 217 (citing Pollock v. Castrovinci (S.D. N.Y. 1979), 476 F.Supp. 606, aff'd 622 F.2d 575 (2d Cir. 1980)). Under the LMRA, a suit for money damages under a collective bargaining agreement regulated by the LMRA is entitled to a jury trial. Fuller, 533 N.Y.S.2d at 217 (citing Allen v. United Mine Workers of Am. (6th Cir. 1963, 319 F.2d 594).

The law is less clear for actions where the participant or beneficiary of an ERISA plan seeks to recover medical benefits.

11

Steeples v. Time Ins. Co. (N.D. Okla. 1991), 139 F.R.D. 688, 691.
ERISA actions to recover these benefits under § 1132(a)(1)(B) may
be brought in either state or federal courts. 29 U.S.C. § 1132(e)
(1988). There is a growing trend in the federal courts and the few
state courts that have addressed the issue, to allow a jury trial
based on the legal nature of the claim. See, e.g., Rhodes v.
Piggly Wiggly Ala. Distrib. Co. (N.D. Ala. 1990), 741 F. Supp.
1542; Vicinanzo v. Brunschwig & Fils, Inc. (S.D. N.Y. 1990), 739 F.
Supp. 882; Gangitano v. NN Investors Life Ins. Co. (W.D. Fla.
1990), 733 F. Supp. 342; Walker v. Sperry & Hutchinson Co. (Sup.
Ct. 1989), 544 N.Y.S.2d 958; and Springer v. Wal-Mart Associates'
Group Health Plan (N.D. Ala. 1989), 714 F.Supp. 1168, rev'd on
other grounds, 908 F.2d 879 (11th Cir. 1990).

Although ERISA as a whole generally deals with trust and
fiduciary issues, the nature of a particular issue determines
whether a jury trial is appropriate. Steeples, 139 F.R.D. at 693.
The historical basis for suits to recover fringe benefits by
employees is steeped in contract law, which has not generally
provided for equitable remedies if legal remedies are available.
In Firestone, 489 U.S. at 112, 109 S.Ct. at 955, 103 L.Ed.2d at 94,
the United States Supreme Court noted that the absence of
discretion regarding the approval or denial of the benefits sought
made that case "like any other contract claim."

This Court has adopted the reasoning of the Eleventh Circuit
Court of Appeals from Lincoln v. Board of Regents of Univ. System
(11th Cir. 1983), 697 F.2d 928, 934, cert. denied, 464 U.S. 826,

**12**

104 S.Ct. 97, 78 L.Ed.2d 102, wherein the court stated:

> An action for reinstatement and back pay under Title VII
> is by nature equitable and entails no rights under the
> seventh amendment.  An action for damages under Section
> 1981, however, is by nature legal and must be tried by a
> jury on demand.

Breese v. Steel Mountain Enterprises (1986), 220 Mont. 454, 716
P.2d 214, 216.

When ERISA is silent, as it is on the matter of jury trials,
it is appropriate in a case decided on state contract law
principles to adopt state law if to do so does not conflict with
the following three queries (known as the Kimball Foods test): (1)
whether the issue requires a nationally uniform body of law; (2)
whether application of state law would frustrate the federal
program's objectives; and (3) whether application of a federal rule
would disrupt commercial relationships predicated on state law.
Mardan Corp. v. C.G.C. Music, Ltd. (9th Cir. 1986), 804 F.2d 1454,
citing United States v. Kimball Foods (1979), 440 U.S. 715, 99
S.Ct. 1448, 59 L.Ed.2d 711.  Applying state law in this instance
does not conflict with the Kimball factors.  Significantly, there
is no uniform federal rule to apply.

Several federal courts have held that a plaintiff seeking
contract or other legal damages under ERISA is guaranteed a jury
trial under the Seventh Amendment to the United States
Constitution.  The District Court here relied on Transamerica
Occidental Life Ins. Co. v. DiGregorio (9th Cir. 1989), 811 F.2d
1249, in which the plaintiff's insurer brought a declaratory
judgment action to interpret a double indemnity clause in its

**13**

contract. The Transamerica court noted that the nature of the underlying controversy, legal or equitable, determines whether a party may properly obtain a jury trial. Transamerica, 811 F.2d at 1251-52.

In Transamerica, the Ninth Circuit upheld the lower court's decision that the claim was legal in nature because it was based upon a contract. Transamerica, 811 F.2d at 1252. The contract involved a life insurance plan, a type of "employee welfare benefit plan" treated like health insurance plans under ERISA. The Heads' claim is also a contract action. It is not a suit against a plan administrator or a fiduciary, but rather is a suit against an insurer to recover benefits under a health insurance policy.

Contract law is traditionally considered to be legal rather than equitable and thus entitles a plaintiff to a jury trial if requested. The District Court here recognized this fundamental distinction and permitted the trial to proceed with a jury. In the Heads' complaint, they alleged a breach of contract and other state law claims. The other state law claims were subsequently dismissed as preempted by ERISA; thus, the case proceeded solely on the contract claim. We agree with the District Court's determination that contract law applies. We conclude that a jury trial was appropriate when plaintiffs sued in state court based on a breach of contract claim under ERISA to recover benefits under a group health insurance plan when issues of fact are controverted.

We hold that the District Court did not err when it denied Central Reserve's motion to dismiss the Heads' jury demand.

**14**

## II.

Did the District Court err in denying Central Reserve's motion for a directed verdict and in granting Pauli's motion for a directed verdict?

After most of the evidence was presented at trial, the District Court granted third-party defendant James R. Pauli's motion for a directed verdict. The Heads did not object to Pauli's motion. The District Court denied Central Reserve's motion for a directed verdict after the remaining evidence was presented.

Central Reserve contends that the issue of Pauli's negligence should have gone to the jury because either Pauli or Jim Head was responsible for the errors on the insurance application. It has maintained the same throughout this proceeding, despite the testimony of its own agent, Ron Kunik, who testified as to his own responsibilities in the application procedure. Kunik further testified that Pauli followed Kunik's instructions.

The District Court found no evidence of negligence on the part of Pauli. A motion for directed verdict is proper only in the complete absence of any evidence to warrant submission to the jury. Britton v. Farmers Ins. Group (1986), 221 Mont. 67, 88, 721 P.2d 303, 317. Contrary to Central Reserve's contention, our review of the record has disclosed nothing to support Central Reserve's claim. We conclude that the District Court correctly found no evidence of negligence on the part of Pauli.

On the other hand, the Heads presented credible evidence relating to the issues of Central Reserve's insurance coverage to

15

warrant submission to the jury. When the District Court considers a motion for directed verdict, all inferences of fact must be considered in the light most favorable to the opposing party. Britton, 721 P.2d at 317. The District Court could reasonably have determined that factual issues were controverted. The jury was charged to determine whether Melissa had ever gone for a period of twelve months without "medical care, diagnosis or advice" relating to her neurofibromatosis. To resolve that question, the jury had to ascertain what the words "medical care" meant under Central Reserve's health insurance plan. We conclude the factual issues warranted submission to the jury.

We hold that the District Court correctly denied Central Reserve's motion for a directed verdict. We further hold that the District Court did not err by granting Pauli's motion for the same.

### III.

Does sufficient credible evidence support the jury verdict?

Central Reserve contends that there is no evidence that Melissa Head ever went for a twelve-month period without "medical care, diagnosis or advice" relating to her neurofibromatosis and that all the evidence establishes that she was never twelve months without medical care.

Central Reserve's argument is based on its own interpretation of the phrase "medical care," which is not defined in Central Reserve's policy. The jury heard a great deal of testimony relating to the definition of that policy term. Medical experts testified that in the broadest sense, the care they provided to

**16**

Melissa would be considered medical care. However, Drs. Weber and Casazza both testified that they were "followed" Melissa's condition and did not render medical care and that they provided no treatment for neurofibromatosis. Both further testified that they made observations and did not give advice or diagnose symptoms. Dr. Weber testified that Melissa could have gone without some of the appointments with him in which he followed her condition, specifically those during the twelve-month time period during which the jury ultimately determined Melissa was without medical care. He further testified that he may not have recommended those visits if he had foreseen there would be this problem with insurance coverage.

In fact, Central Reserve did not use the term "medical care" in its correspondence to the Heads refusing to cover the medical expenses--it merely used the words "treatment free" without further explanation. If the terms of an insurance policy are ambiguous, obscure or open to different constructions, the construction most favorable to the insured or other beneficiary must prevail, particularly if an ambiguous provision in the policy attempts to exclude the liability of an insurer. Atcheson v. Safeco Ins. Co. (1974), 165 Mont. 239, 247, 527 P.2d 549, 553.

Central Reserve's literal interpretation of "medical care" in this case attempts to exclude its liability and prevent Melissa Head from meeting the requirements of the preexisting conditions clause in its policy. In Brasher v. Prudential Ins. Co. of Am. (W.D. Ark. 1991), 771 F. Supp. 280, 282-83, the court discussed a

**17**

requirement in a disability insurance policy coming within the ambit of ERISA which prevented the plaintiff from qualifying as "totally disabled" under the policy. The plaintiff conceded that a literal application of the policy language would preclude recovery in his case but contended that such an interpretation required him to be practically catatonic before being entitled to benefits. He supported his public policy argument by citing Helms v. Monsanto Co. (11th Cir. 1984), 728 F.2d 1416, 1420, reh'g denied, 734 F.2d 1481 (1984), in which the court refused to adopt a strict and literal interpretation of the policy's definition of "total disability" that would preclude all but the entirely helpless from receiving benefits and in which the court adopted a more realistic definition. Brasher, 771 F. Supp. at 282. See also, Russell v. Prudential Ins. Co. of Am. (5th Cir. 1971), 437 F.2d 602; Madden v. ITT Long Term Disability Plan for Salaried Employees (9th Cir. 1990), 914 F.2d 1279, 1285, cert. denied, ___ U.S. ___, 111 S.Ct. 964, 112 L.Ed.2d 1051 (citing Helms); and Torix v. Ball Corp. (10th Cir. 1988), 862 F.2d 1428, 1431 (recovery may not be denied on the basis of overly restrictive interpretations of the plan's language).

The Brasher court noted that under the Helms construction, a material question existed as to whether or not the plaintiff was "totally disabled." That analysis is similar to the interpretation of "medical care" as applied to Melissa Head.

Our review of a jury verdict is very narrow in scope. We will not reverse the jury's findings if they are supported by

**18**

substantial credible evidence. Whiting v. State (1991), 248 Mont. 207, 213, 810 P.2d 1177, 1181. Substantial evidence is defined as that evidence that a reasonable mind might accept as adequate to support a conclusion. When conflicting evidence exists, the weight and credibility given to it are within the province of the jury. Whiting, 810 P.2d at 1181. Evidence which is inherently weak and conflicting may still be considered substantial. Further, when determining if substantial evidence exists, this Court views the evidence in the light most favorable to the prevailing party. Whiting, 810 P.2d at 1181.

We conclude that there is substantial evidence in the record for the jury to reasonably interpret the policy to find that Melissa received no medical care for neurofibromatosis for a twelve-month period.

We hold that there is substantial credible evidence to support the jury verdict.

## IV.

Did the District Court err when it awarded attorney's fees to the Heads?

The District Court granted the Heads' post-trial motion for attorney's fees and costs and awarded an amount of 25% of the jury verdict plus costs of $4,165.73 for a total of $47,357.01 in fees and costs. Central Reserve contends that the Heads did not meet the test for awarding fees. They contend, further, that if fees and costs are allowed, the amount awarded here is excessive and should be limited to a "lodestar" determination.

**19**

An award of attorney's fees is discretionary in an ERISA action by a participant or beneficiary to recover benefits. 29 U.S.C. § 1132(g)(1) (1988). A determination to award attorney's fees in an ERISA action should only be reversed for abuse of discretion. Hummell v. S. E. Rykoff & Co. (9th Cir. 1980), 634 F.2d 446, 452. An abuse of discretion is found only when there is a definite conviction that the court made a clear error of judgment in its conclusion upon weighing relevant factors. Hummell, 634 F.2d at 452. This requires the trial court to state its reasons for granting or denying fees. Hummell, 634 F.2d at 452-53. In Hummell, the Ninth Circuit adopted the following guidelines to apply in the exercise of discretion under § 1132(g)(1):

> They should consider these factors among others: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of fees; (3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.

Hummell, 634 F.2d at 453.

The courts have almost universally adopted the above five factors for consideration in determining whether to award fees. Garred v. Gen. Am. Life Ins. (W.D. Ark. 1991), 774 F. Supp 1190, 1201.

In Landro v. Glendenning Motorways, Inc. (8th Cir. 1980), 625 F.2d 1344, 1356, the court stated that "§ 1132(g), like the rest of ERISA, is remedial legislation that should be construed liberally in favor of those persons it was meant to benefit and protect" and that a prevailing participant in a suit under § 1132 to enforce

rights under his plan, "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." The Landro court further stated that mere absence of bad faith on the part of the losing defendant is not such a "special circumstance." Landro, 625 F.2d at 1356.

The District Court here noted the Landro rationale for awarding fees to those persons who are to be protected and benefitted by ERISA in its reasoning for awarding fees to the Heads, stating:

> . . . [T]he Heads appear totally unable to pay attorney fees and if attorney fees are paid out of the jury's award, the Heads will still have unpaid medical bills in a similar amount. Given the Heads inability to pay and the apparent ability of the insurance company to pay, an (sic) given the fact that the Heads were required to go to court to obtain an interpretation of a somewhat ambiguous provision, Heads should recover their attorney fees and costs.
> Balancing the factors traditionally used by Montana Courts and also used by the Ninth Circuit, the Court is of the opinion that the 25% contingency fee is very reasonable. Considering the likelihood that no recovery would be had at all, the difficulty and high stress nature of the case, the inherent delay and the degree of skill and perseverance required, as well as the result obtained, the Court finds that both the $43,191.28 attorney fees and the $4,165.73 in attorney costs would be allowable. (Citations omitted.)

The District Court cited Stimac v. State (1991), 248 Mont. 412, 812 P.2d 1246, in which we held that courts should consider eight factors when assessing whether to award the full amount of the contingent-fee agreement as a reasonable attorney's fee under § 39-3-214(1), MCA. Those factors include: (1) the novelty and difficulty of the issues; (2) the time and labor required to properly perform the legal service; (3) the character and importance of the litigation; (4) the result obtained; (5) the

21

experience, skill and reputation of the attorney; (6) the customary fee for similar services; (7) the ability of the client to pay for the services; and (8) the risk of no recovery. Stimac, 812 P.2d at 1249. The District Court's order specifically states that it considered relevant factors from both Hummell and Stimac in making the decision to allow fees. We conclude that the District Court considered the proper factors in determining whether to award attorney's fees and clearly stated the reasoning behind the decision.

Central Reserve alternatively asserts that even if the District Court properly determined that the Heads were entitled to attorney's fees, it abused its discretion by awarding the Heads attorney's fees in the amount of $43,357.01. This Court recently addressed the proper determination of attorney's fees in an ERISA action in Audit Services, Inc. v. Frontier-West, Inc., (1992), 252 Mont. 142, 827 P.2d 1242. In Audit Services, we approved the "lodestar/multiplier" approach, which essentially contains two parts: (1) the district court must determine a "lodestar" amount by multiplying a reasonable hourly rate for the area by the number of hours reasonably expended on the case; and (2) decrease or increase the "lodestar" amount based on other factors from Kerr v. Screen Extras Guild, Inc. (9th Cir. 1975), 526 F.2d 67, cert. denied (1976), 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195. Audit Services, 827 P.2d at 1251.

We further stated that the "results obtained" factor is particularly important and "where a party has obtained excellent

results, counsel should recover a full compensatory fee." Audit Services, 827 P.2d at 1250. We noted that the district court "necessarily has discretion in making the equitable judgment of whether the fees requested are excessive." Audit Services, 827 P.2d at 1252.

Here, the District Court followed the "lodestar/multiplier" approach. We will not overturn its decision absent an abuse of discretion. Counsel for the Heads presented testimony subject to cross-examination and submitted an affidavit as well, detailing his time spent on the case. He presented testimony to establish that 208.10 hours was a reasonable amount of time for a case such as this. He testified that he multiplied hours by $75 prior to January 1, 1991 and $80 after that date for himself, by $70 per hour for an associate and by $35 per hour for paralegals to arrive at the total of $14,744.50. Another attorney in the Kalispell area testified that the hourly rate, whether it be $75 or $80 per hour, is very reasonable for that particular area and in fact is probably on the low end for someone of similar experience in such a case.

Counsel for the Heads further testified that he agreed to represent the Heads for a 25% contingency fee, less than his standard contingent rate, while knowing from the beginning that the case would generate many hours of work. He testified that he accepted the case because he wanted a declaration that Melissa was entitled to future medical benefits as well as past benefits and because he was aware of the heavy debt owed by the Heads. He also testified that he felt that the issues were such that the case

could as easily have been lost before the jury as won. The issues in this case were by no means clearly in favor of his clients and he bore a substantial risk of no recovery for them, in which case he too may have recovered nothing.

In Audit Services, we affirmed an award of an attorney's fee greater than the lodestar amount. Audit Services, 827 P.2d 1252. The initial lodestar amount is presumed to be a reasonable attorney's fee. However, the court has discretion to increase or decrease this amount as circumstances warrant. Audit Services, 827 P.2d at 1250. "Although fee awards are left to the discretion of the district court, '[i]t remains important . . . for the district court to provide a concise but clear explanation of its reasons for the fee award'." Audit Services, 827 P.2d at 1250-51, quoting Hensley v. Eckerhart (1983), 461 U.S. 424, 103 S.Ct 1933, 76 L.Ed.2d 40.

The initial lodestar amount here for attorney's fees was $14,744.50. The District Court increased the award to $43,357.01, an amount equal to 25% of the judgment against Central Reserve for medical expenses, the agreed upon contingency fee in this case. In its decision to increase the lodestar amount here, the District Court properly considered the Stimac factors, which are similar to those used by the Ninth Circuit in awarding fees. See Moore v. Jas. H. Matthews & Co. (9th Cir. 1982), 682 F.2d 830, 838-39. In Moore, the Ninth Circuit remanded the case for a redetermination of attorney's fees using a lodestar/multiplier approach. Moore, 682 F.2d at 839-41. We conclude that the District Court has provided

**24**

an adequate rationale to support its decision as to the amount of attorney's fees to be awarded to the Heads and that it was not an abuse of discretion to award attorney's fees in excess of the original lodestar amount.

We hold that the District Court did not err in its award of attorney's fees. Counsel for the Heads has stated that should this appeal be affirmed, he will seek additional attorney's fees connected with this appeal. We therefore remand this case to the District Court for consideration of an additional award of attorney's fees to compensate the Heads' counsel for his services connected with this appeal.

Affirmed and remanded for consideration of additional attorney's fees.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

25